Christopher JEFFES, John E. Keenan, Jr. and Jerry Carlos, Plaintiffs,

v.

William BARNES, Individually and as Sheriff of the County of Schenectady; Harry Buffardi, Individually and as Undersheriff of the County of Schenectady; Robert Elwell, Sr., Individually and as an Employee of the County of Schenectady; "John Does" being unnamed Employees of the County of Schenectady; and the County of Schenectady, Defendants.

No. 97–CV–0214.

United States District Court, N.D. New York.

Sept. 16, 1998.

Tobin and Dempf, Albany, New York, for Plaintiff; Kevin A. Luibrand, of counsel.

O'Connell and Aronowitz, Albany, New York, for Defendants William Barnes, Harry Buffardi, and Robert Elwell, Sr.; Michael L. Koenig, of counsel.

Thorn and Gershon, Albany, New York, for Defendant County of Schenectady; Sheila Toborg, of counsel.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

This action arises out of events surrounding the movement of inmates at the Schenec-

tady County Jail ("County Jail") in April 1994 in which a number of inmates alleged that they were severely beaten by corrections officers while being transported between jails. Subsequently, the inmates brought suit against the defendants named in this action and other employees of Schenectady County. A federal criminal investigation also commenced, and a multi-count federal indictment was brought against four corrections officers.

Plaintiffs Christopher Jeffes ("Jeffes"), John E. Keenan ("Keenan"), and Jerry Carlos ("Carlos"), present and former employees of the Schenectady County Sheriff's Department (the "Department"), bring this action under 42 U.S.C. § 1983, alleging that the defendants, the County of Schenectady ("Schenectady County"), William Barnes ("Barnes"), Harry Buffardi ("Buffardi"), Robert Elwell, Sr. ("Elwell"), and unnamed employees of Schenectady County, violated the plaintiffs' First Amendment rights by fostering, encouraging, and permitting a campaign of retaliation and harassment against them for reporting the misconduct of their co-workers in connection with the alleged beating incident.

Defendants Schenectady County, Barnes, Buffardi, and Elwell now move for summary judgment.

## I. Background

Plaintiff Jeffes was hired by the Department as a Correction Officer in 1979. Jeffes was employed continually by the Department from 1979, until December 8, 1994, the time he left. Pl. Rule 7.1(f) Stat. at ¶¶ 1, 16. During that time, Jeffes was promoted to Lieutenant and appointed provisional major by defendant Barnes. Jeffes Dep. at 27, 45–53. During his employment at the Department, Jeffes was not the subject of any disciplinary action, Jeffes Aff. ¶ 2, and no complaints were filed against him in the recent years prior to his departure. Barnes Dep. at 91, 101, 104–05, 112. Jeffes alleges that he was unable to continue to work at the jail and feared for his life due to acts of retaliation and harassment following his reporting of alleged officer misconduct at the jail. In August 1997, after failing to return to work

pursuant to written notice, Jeffes was served with a Notice of Disciplinary Action stating that he was terminated effective August 31, 1997. Def. Schenectady County Rule 7.1(f) Stat. at ¶ 9.

Plaintiff Keenan was hired by the Department as a Correction Officer in 1982. After a provisional lay-off, he was rehired and subsequently appointed as a Booking Officer, the position he retained until he left the Department on July 23, 1996. Keenan Dep. at 11–13. Keenan was not the subject of any complaints in the recent years preceding his leaving the Department, and had in fact received numerous commendations during this time. Barnes Dep. at 172–74, 175–77. Keenan alleges that he was unable to continue to work at the jail and feared for his life due to acts of retaliation and harassment following his cooperation with federal authorities investigating alleged officer misconduct at the jail. In July 1997, after failing to return to work pursuant to written notice, Keenan was served with a Notice of Disciplinary Action stating that he was terminated effective July 7, 1997. Def. Schenectady County Rule 7.1(f) Stat. at ¶ 23.

Plaintiff Carlos was hired by the Department as a Correction Officer in 1981. He is currently employed in that same position. Carlos Dep. at 7, 59.

On April 29, 1994, an incident allegedly occurred at the County Jail during the movement of a group of inmates from one section of the jail to another. These events later became the subject of an investigation by the U.S. Department of Justice concerning allegations that inmates were beaten by corrections officers during the transfer. Although Keenan and Carlos were on duty at the County Jail when the transfer occurred, Jeffes was not. Keenan Dep. at 20–22; Carlos Dep. at 18–20; Jeffes Dep. at 79. Keenan and Carlos later testified to activity surrounding the transfer of the inmates that they witnessed while present in the booking area. Keenan Dep. at 21–23, 28–30; Carlos Dep. at 35–37. Keenan and Carlos both testified at Grand Jury proceedings and a federal criminal trial in connection with activities surrounding the transfer. Def. Schenectady County Rule 7.1(f) Stat. ¶¶ 25, 26, 29,

30. Jeffes only testified at the Grand Jury proceedings. Def. Schenectady County Rule 7.1(f) Stat. ¶ 5,6. Around early November, 1994, Jeffes appeared on television, with his voice and physical appearance disguised, making public statements concerning the alleged use of excessive force by correction officers upon inmates at the County Jail on April 29, 1994. Def. Schenectady County Rule 7 .1(f) Stat. at ¶ 3; Pl. Rule 7.1(f) Stat. at ¶¶ 2–4. Following this broadcast, Jeffes alleges that he was subjected to continued retaliation and harassment by his co-workers. Pl. Rule 7.1(f) Stat. at ¶¶ 9, 10. Keenan and Carlos similarly allege retaliation and harassment resulting from their cooperation with the Department of Justice investigation.[1] Pl. Rule 7.1(f) Stat. at ¶¶ 19–24; Keenan Dep. at 40–44; Carlos Dep. at 45–54; 57–61. Plaintiffs do not identify Barnes, Buffardi, or Elwell as directly engaging in any acts of retaliation themselves. Jeffes Dep. at 128–30; Keenan Dep. at 41, 61; Carlos Dep. at 12–16. Rather, plaintiffs seek to hold Barnes, Buffardi, and Elwell liable for their personal involvement under the doctrine of supervisory liability, claiming that they encouraged, authorized, approved, and acquiesced in the unconstitutional conduct of their subordinate employees. Pl. Compl. at ¶¶ 37–39, 40–45. Plaintiffs also seek to hold defendant Schenectady County liable for the alleged retaliation and harassment by its employees under *Monell* and its progeny.

## II. DISCUSSION

### A. Summary Judgment

The Court will now address defendants' motions for summary judgment.

#### 1. The Standard for Summary Judgment

The standard for summary judgment is well-settled. Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 86 (1996). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Matsushita,* 475 U.S. at 585–86, 106 S.Ct. 1348. A dispute regarding a material fact is genuine if a reasonable jury could return a verdict for the non-moving party; that is, whether the non-movant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds, however, could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985) *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), the motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware &*

---

1. The Justice Department investigation led to a federal criminal prosecution for civil rights violations, naming four correction officers in the April 29, 1994 incident. All of those defendants were acquitted on all counts. Def. Barnes et al. Rule 7.1(f) Stat. at ¶ 12.

*H.R. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348); *see also Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990). Indeed, the nonmoving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

The Court is mindful that in cases where the employer's state of mind or motives are at issue, records of the employer will rarely document such factors, and as such, the materials before the district court in a summary judgment motion "must be carefully scrutinized" for circumstantial evidence about the employer's state of mind and those factors that motivated the challenged course of action. *See Chertkova,* 92 F.3d at 87; *Chambers v. TRM Copy Cntrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). Where such subjective issues are "squarely implicated," a multitude of factual inferences may arise where "reasonable persons may differ in their resolution." *Patrick v. LeFevre,* 745 F.2d 153, 159 (1984).

It is with these considerations in mind that the Court addresses defendants' motions for summary judgment.

### 2. Liability Under § 1983

Defendants Barnes, Buffardi, and Elwell move for summary judgment dismissing plaintiffs' § 1983 claim against each defendant in both their individual and official capacities. Defendant Schenectady County also moves for summary judgment. Because official-capacity claims involve issues of municipal liability, the distinction between personal-capacity and official-capacity suits is critical in analyzing the liability and defenses of the defendants.

▌ The Supreme Court, in *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), explained the relevant differences between the two types of claims:

> Personal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity.

*Id.* at 165–66, 105 S.Ct. 3099 (emphasis in original) (internal citations omitted) (quoting *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Because official-capacity claims are equivalent to claims against the entity, a plaintiff must establish that "the entity's policy or custom played a role in the violation of federal law." *Hafer v. Melo,* 502 U.S. 21, 24–25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (quoting *Graham,* 473 U.S. at 166, 105 S.Ct. 3099). This necessarily requires a *Monell*-type analysis sufficient to predicate liability for the governmental entity. For the same reasons, individuals sued in their official capacity are entitled only to those immunities and defenses that the governmental entity itself possesses. *See id.* at 25, 112 S.Ct. 358.

▌ In contrast, personal-capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law." *Id.* Thus, in establishing personal liability in a § 1983 claim, a plaintiff need only show that "the [government] official, acting under color of state law, caused the deprivation of a federal right." *Id.* (citing *Graham,* 473 U.S. at 166, 105 S.Ct. 3099). Accordingly, a plaintiff need not show a connection to a governmental policy or custom that is required under *Monell* and its progeny. When such government officials are sued in their personal capacities, "they may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Id.*

▌ Based upon this distinction, district courts have dismissed official-capacity claims against individuals as redundant or unnecessary where *Monell* claims were also asserted against the entity. *See, e.g., Union Pacific R.R. v. Village of S. Barrington,* 958 F.Supp.

1285 (N.D.Ill.1997); *Vance v. Santa Clara*, 928 F.Supp. 993 (N.D.Cal.1996); *Doe v. Rains Indep. Sch. Dist.*, 865 F.Supp. 375, 378 (E.D.Tex.1994), *rev'd on other grounds*, 66 F.3d 1402 (5th Cir.1995); *Doe v. Douglas County Sch. Dist.*, 775 F.Supp. 1414, 1416 (D.Colo.1991). In this case, because plaintiffs bring both official-capacity claims against the individual defendants and a *Monell*-type claim against Schenectady County, the Court dismisses plaintiffs' official-capacity claims against Barnes, Buffardi, and Elwell.

The Court now addresses defendants' motions insofar as they attack plaintiffs' personal-capacity § 1983 claims.

**B. First Amendment Claim**

 To prevail on a First Amendment retaliation claim under section 1983, plaintiffs must establish that "(1) their 'conduct is deserving of First Amendment protection' and (2) the defendants' conduct 'was motivated by or substantially caused by plaintiffs' exercise of free speech.'" *Hankard v. Town of Avon*, 126 F.3d 418, 421–22 (2d Cir.1997) (citations omitted); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Bernheim v. Litt*, 79 F.3d 318, 324 (2d Cir. 1996). Recognizing that a public employee's right to freedom of speech is not absolute, courts have employed an additional balancing test when disputes arise involving First Amendment rights of public employees. *See Bernheim*, 79 F.3d at 324. Here, the court must determine whether the employee's interests in commenting on matters of public concern outweigh the government's interest in maintaining effective and efficient public services for its citizens. *See id.; see also Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The Court analyzes the plaintiffs' personal-capacity claims in light of these well-settled standards.

 Our initial inquiry requires an examination of the plaintiffs' speech to determine whether it is deserving of First Amendment protection. Courts have made clear distinctions regarding the type of speech and conduct that merit such protection. At one end of the spectrum, the First Amendment affords no protection to employee speech and conduct that qualifies as insubordination or "'that impedes an employee's performance of his duties or that interferes with the proper functioning of the workplace.'" *Hankard*, 126 F.3d at 422 (quoting *Domiano v. Village of River Grove*, 904 F.2d 1142, 1145 (7th Cir.1990)). In such instances, an employee cannot claim First Amendment protection nor federal court review, for matters involving lawful tasks within the scope of the employee's duties or matters concerning internal office affairs that do not give rise to matters of public concern. *See Connick*, 461 U.S. at 146–47, 103 S.Ct. 1684 (internal questionnaire distributed by assistant district attorney criticizing decisions of her supervisors); *Hankard*, 126 F.3d at 423 (requirement that review board take further action pursuant to local police general order prior to submitting its final report was lawful and within scope of board's duties).

 At the other end is employee speech on matters of legitimate public concern, which is entitled to First Amendment protection. *See Connick*, 461 U.S. at 140, 103 S.Ct. 1684 ("[T]he Supreme Court has frequently affirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.") (citations omitted); *Bernheim*, 79 F.3d at 325 ("These are issues of serious interest to the community ... [that employees] should be able to speak freely about ... without fear of retaliation.")

 In the present case, plaintiffs allege that their supervisors and co-workers retaliated against them for publicly disclosing the misconduct of their co-workers and cooperating in the federal criminal investigation and subsequent prosecution. One would be hard-pressed to find a clearer example of speech that is more appropriately classified as a matter involving public concern and deserving of First Amendment protection. *Accord Mt. Healthy City Sch. Dist. Bd. Of Educ.*, 429 U.S. at 282, 97 S.Ct. 568 (disclosure of

school dress code on local radio station); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (testimony before state legislature regarding college status); *Bernheim,* 79 F.3d at 325 (statements regarding quality of education provided by public school). Notably, defendant Schenectady County concedes this point. Schenectady County Mem. of Law at 5. Plaintiffs could conceivably have been compelled to disclose such events to the federal authorities and Grand Jury investigating the alleged inmate abuse. Because the plaintiffs have engaged in conduct that implicates First Amendment protection, the Court must now consider whether the defendants' alleged conduct was motivated or substantially caused by plaintiffs' speech.

The starting point for this analysis is plaintiff Jeffes television interview describing the alleged abuses occasioned during the inmate transfer. A tape of the interview, discussing allegations concerning jail operations and recent activities, was made by defendant Buffardi. Soon thereafter, Buffardi delivered the tape to defendant Barnes at the County Jail where they both viewed the tape in a training office located in the administrative area of the jail. Buffardi Dep. at 31–34. Not surprisingly, correction officers were angered over the negative publicity generated by the tape. Buffardi Dep. at 61. There was considerable conversation surrounding the contents of the broadcast, and speculation grew among the officers that Jeffes was the disguised individual that reported the allegations of inmate abuse at the County Jail. Elwell Dep. at 112–14; Barnes Dep. at 68. Although Barnes, Buffardi, and Elwell initially believed that Jeffes might be the anonymous informer on the tape, Elwell Dep. at 117; Buffardi Dep. at 41, substantial efforts were undertaken by Barnes and Buffardi to confirm their suspicions. Once Jeffes' identity was confirmed, many of Jeffes' coworkers, some of whom were the target of the federal investigation, were invited to view the tape with Barnes and Buffardi. In response to Jeffes reporting the alleged misconduct at the jail, Barnes reduced much of Jeffes' responsibilities as a lieutenant, while maintaining his title and salary level. Jeffes Dep. at 6, 132.

After first attempting to identify the disguised officer by using the services of a local television station, Buffardi Dep. at 36, 40, Barnes ordered Buffardi to have the tape analyzed at Griffiss Air Force Base, where more advanced technology was available to enhance the videotape and identify the disguised officer. Buffardi Dep. at 63–66. When initial efforts failed to identify Jeffes as the disguised officer, Buffardi obtained a copy of another tape with Jeffes' voice, recorded some years earlier, to match against the interview tape. Buffardi Dep. at 70–72; Pollard Dep. at 54. A voice print analysis confirming Jeffes as the disguised officer was delivered to Buffardi and communicated to Barnes around December 1994. Buffardi Dep. at 76–77.

Realizing that outright disciplinary action would be "indefensible under the First Amendment," Buffardi Dep. at 85, 89, defendants sought a more creative solution to their problems. With confirmation of Jeffes as the informer in hand, Barnes and Buffardi began showing the tape to Jeffes' co-workers. Buffardi Dep. at 57–58; 81–82; 83–88; Jones Dep. at 67–69; Broderick Dep. at 48, Ex. 22; Jeffes Dep. at 11. Aware that it would make Jeffes a "marked man" and the likely subject of retaliation and harassment, Barnes and Buffardi continued to show this tape while aware that guessing the identity of the "rat" was the "big thing" among jail employees. Broderick Dep. at 46, 59. One of the defendants charged in the federal criminal indictment, the subject of previous disciplinary action and alleged to be "contentious" and "aggressive," encouraged others to "go upstairs and view the tape to see who it really was." Buffardi Dep. at 182–83; Broderick Dep. at 58–59. It does not require much thought to figure out how officers facing a criminal trial as a result of the events alleged in the tape might react to a co-worker who reported such information to the authorities. As sentiment mounted against Jeffes, Keenan, and Carlos once they were labeled as "rats," their co-workers felt that they no longer belonged at the jail, Broderick Dep. at 50, and efforts were made to "provoke [Jeffes] into doing something or incite him into doing something, [so] we could set him

up and then we can get him." Jeffes Dep. at 11; Carlos Dep. at 54. Sheriff Barnes informed Jeffes that he would engage in similar conduct. Jeffes Dep. at 7.

Defendants rely on the plaintiffs' denial of medical benefits [2] by an independent agency and subsequent termination for a failure to report to work to disclaim that any actions by the defendants were motivated by plaintiffs' exercise of free speech. Such reliance is misdirected in that it overlooks the substantive allegations of retaliation and harassment that are the gravamen of the plaintiffs' claim.

Jeffes was characterized as a "rat" in posters around the jail, and some co-workers allegedly threatened his life. Jeffes Aff. at ¶ 4. Radio communications made by Jeffes were interrupted, thus preventing him from communicating with other officers or seeking help if the need arose. Jeffes Dep. at ¶ 7. References to being a "rat" and "snitch" were also made when Jeffes attempted to speak on the radio. Jeffes Aff. at ¶ 8. These radio communications between the officers were monitored by Jeffes' supervisors, defendants Barnes, Buffardi, and Elwell. Jeffes Aff. at ¶¶ 6, 9. Plaintiffs Keenan and Carlos faced a similar reaction from their co-workers after testifying at the Grand Jury investigation and the criminal trial. Keenan Aff. at ¶¶ 3–6; Carlos Dep. at 45–58. These allegations present a genuine issue of material fact whether the plaintiffs' reporting of inmate abuse and officer misconduct were a substantial motivating factor in the alleged retaliation and harassment that was taken against them. *See Bernheim,* 79 F.3d at 325; *see also Colon v. Coughlin,* 58 F.3d at 865, 872 (noting that a "temporal proximity" between initial speech or conduct giving rise to First Amendment protection and subsequent disciplinary action may serve as circumstantial evidence of retaliation).

In balancing the interests of the respective parties, the defendants' actions can hardly stand against the exceptionally strong gov-ernment interest in investigating alleged civil rights violations. Plaintiffs' were reporting matters of public concern and the alleged actions of the defendant were not aimed at " 'promoting efficiency and integrity in the discharge of official duties.' " *Connick,* 461 U.S. at 151, 103 S.Ct. at 1692. Rather, plaintiffs became the victims of an alleged campaign of retaliation and harassment initiated by their supervisors and carried out by his co-workers, angered by plaintiffs' reporting of officer misconduct.

Having established that such alleged retaliation and harassment could reasonably have been motivated by plaintiffs' protected speech, the Court must now consider whether plaintiffs have suffered a harm rising to the level of a constitutional deprivation for which they may seek recovery.

## C. Constitutional Deprivation

In *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Supreme Court recognized that there are "deprivations less harsh than dismissal that nevertheless press [government] employees ... to conform their beliefs and associations to some [government]-selected orthodoxy." *Id.* at 75, 110 S.Ct. 2729. Indeed, in a much debated footnote, the Supreme Court indicated that government employees are protected from even trivial acts of retaliation from their employers. *Id.* at 76 n. 8, 110 S.Ct. 2729. This Court does not intend to further this debate at this time. It need only decide if the allegations, when examined in the aggregate and with all reasonable inferences in favor of the plaintiffs, are sufficient to constitute a legally cognizable claim under section 1983. Whether such action impose liability on the defendants based on their personal involvement is a separate issue, to be discussed later.

After *Rutan,* "the scope of harm actionable under the First Amendment is broader than actual or constructive discharge from employment." *Pierce v. Texas Dep't Of Crimi-*

---

2. Plaintiffs Jeffes and Keenan each applied for 207–c benefits based on their medical condition and disabilities that were related to their allegations of retaliation and harassment and their ability to function as correction officers. After each plaintiff's application was rejected, they were ordered to return to work. When Jeffes and Keenan failed to do so, they were served with notices of termination.

*nal Justice,* 37 F.3d 1146, 1149 (5th Cir. 1994), *cert. denied,* 514 U.S. 1107, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995). In rejecting the stricter standards employed by other courts, the Supreme Court in *Rutan* held that employment decisions that fall short of the "substantial equivalent of dismissal" are sufficient to establish that a public employee's rights under the First Amendment may have been violated. *Rutan,* 497 U.S. at 74, 110 S.Ct. 2729. While analyzed in the context of political patronage activities, this standard has been applied to First Amendment retaliation claims under section 1983. *See Bernheim,* 79 F.3d at 324; *Pierce,* 37 F.3d at 1149; *Dorsett v. Bd. of Trustees for State Colleges and Univs.,* 940 F.2d 121, 123 (5th Cir.1991).

While recognizing that the "First Amendment is not a tenure provision," the Supreme Court in *Rutan* noted that there are constitutional deprivations that fall short of actual or constructive discharge or disciplinary actions that are sufficient to sustain a claim under section 1983. *See Rutan,* 497 U.S. at 76, 110 S.Ct. 2729. In *Lieberman v. Reisman,* 857 F.2d 896 (2d Cir.1988), a pre-*Rutan* case that also dealt with First Amendment issues, the Second Circuit arguably adopted a broader standard in such First Amendment cases, covering instances where "unfavorable action" is taken under color of state law against employees exercising their constitutional rights. *See Lieberman,* 857 F.2d at 900. In *Bernheim,* a post-*Rutan* case, the Second Circuit advocated an approach whereby plaintiff's allegations should be viewed in the totality, and did not require actual or constructive discharge as a predicate for a section 1983 claim. *See Bernheim,* 79 F.3d at 325 (noting that an absence of allegations of dismissal from employment is not fatal to plaintiff's claim).

In the present case, both parties offer considerable argument about whether the plaintiffs were constructively discharged as a result of the acts of retaliation and harassment that allegedly forced them to leave their positions.[3] As the *Bernheim* Court noted, allegations of harassment "which

caused ... great worry and unhappiness" may give rise to a compensable injury. *Bernheim,* 79 F.3d at 325. The Court will now analyze the plaintiffs' allegations against these established standards.

In *Bernheim,* the plaintiff established a viable section 1983 retaliation claim based on actions by her employer that affected her employment status and allegations of harassment. *See Bernheim,* 79 F.3d at 325. Notably, such claim survived a motion to dismiss even though the allegations did not give rise to an actual or constructive discharge. *Id.* (changes in position and assignments, criticisms, wrongful accusations of timeliness, and efforts to make job more difficult sufficient to sustain First Amendment retaliation claim).

Like the Second Circuit did in *Bernheim,* the Court views the plaintiffs' allegations in their totality in determining whether a legally cognizable claim exists. *See Chertkova,* 92 F.3d at 90 (advocating an analysis of plaintiff's claims cumulatively rather than separately and distinctly). Here, the plaintiffs' allegations, examined in a light most favorable to them, are sufficient to defeat a summary judgment motion. Plaintiffs have alleged that they were the subject of retaliation and harassment for publicly reporting the misconduct of their co-workers. The affidavits and depositions submitted by the parties bare this out. Such actions included the designation of a "rat" among co-workers that was conveyed on posters and over the radio; an inability to communicate with other officers over the radio if the need arose; threats to their safety; numerous hang-up telephone calls; visits to their home offering "protection" from harm; reassignment of duties and reduced responsibilities; disciplinary action for acts previously accepted by their supervisors; and general threats indicating that co-workers and supervisors were going to incite problems and make their lives difficult. Plaintiffs' allegations paint a picture of being ostracized from their co-workers and unable to rely on their assistance in the course of their duties. These allegations, when viewed in the aggregate, take on added

---

3. In fact, only plaintiffs Jeffes and Keenan have left their positions at the County Jail and plaintiff Carlos is still employed at the County Jail. Pl. Local Rule 7.1(f) Stat. at ¶¶ 16, 20.

importance given the nature of the plaintiffs' jobs and the dangers associated with their work. The plaintiffs had a reasonable fear that they could face life-threatening situations unassisted because their requests would go unanswered. Furthermore, because plaintiffs' supervisors were allegedly initiating and encouraging such actions, there was effectively little chance that the situation would be remedied. The focus of the defendants on the fact that plaintiffs retained their rank and pay and their duties reassigned to "lighten their workload" is misplaced in light of the seriousness of the alleged acts of retaliation and harassment that the plaintiffs faced on a daily basis. These alleged acts fall well beyond the merely "juvenile conduct" that the defendants would have the Court believe, and when viewed in their totality, are sufficient to establish a valid section 1983 claim based on First Amendment retaliation. *See Bernheim,* 79 F.3d at 326; *Lieberman,* 857 F.2d at 900. *Compare Dorsett,* 940 F.2d at 123–24 (intrafaculty disputes concerning teaching assignments, administrative duties, and internal department procedures insufficient to sustain claim of constitutional deprivation).

■■■■ The claims of Jeffes and Keenan can equally survive defendants' summary judgment motions when examined in light of the standards established for a constructive discharge. Constructive discharge occurs when "an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova,* 92 F.3d at 89. Working conditions are deemed intolerable if they are " 'so difficult or unpleasant that a reasonable person in the employee's shoes should have felt compelled to resign.' " *Id.* (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir. 1987)); *Christopher–Ketchum v. Agway Energy Prods.,* 988 F.Supp. 610, 616 (N.D.N.Y. 1997). A claim of constructive discharge cannot be maintained, however, if the employee merely alleges dissatisfaction with the nature of his assignments, *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325–26 (2d Cir.1983), unfair criticism, *Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1160–61 (3d Cir.), *cert. denied,* 510 U.S. 964, 114 S.Ct. 441, 126

L.Ed.2d 374 (1993), or if the working conditions are difficult or unpleasant. *See Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993).

■■■■ Here, plaintiffs Jeffes and Keenan have presented evidence sufficient to overcome a motion for summary judgment on the basis of constructive discharge. Based on their allegations, a reasonable person could find that their working conditions were made intolerable by their supervisors and co-workers. Defendants should not be able to disguise their retaliatory and harassing actions behind the thin veil of "reassignment of duties" and no loss in pay or job title. A finding of constructive discharge should not be precluded simply because the employer did not expressly threaten to discharge the employee. Indeed, plaintiffs allege far more subtle techniques employed by their supervisors and co-workers to effectuate a similar result. Assuming the plaintiffs' allegations are true, as we must on a summary judgment motion, one finds acts of retaliation and harassment set in motion by the defendants and left unchecked. This foreclosed any remedy for the plaintiffs since those that set the policies of the jail and monitored the working conditions of the jail were also responsible for allegedly initiating and permitting the retaliation and harassment. Additionally, plaintiffs allege that the defendants did not investigate reports and concerns of the effect of such internal conflict, leaving the plaintiffs without any avenue of redress. Broderick Dep. at 60 ("I felt this was a definite problem because it was—it would cause maybe an officer to get killed."). When viewed in the aggregate, a trier of fact could reasonably find that such allegations give rise to a claim of constructive discharge. Recognizing that such an inquiry is fact intensive, this Court only decides that such actions are inconsistent with the Constitution and that the plaintiffs' allegations state claims under 42 U.S.C. § 1983 for violations of their First Amendment rights. *See Rutan,* 497 U.S. at 76, 110 S.Ct. 2729.

Having found that plaintiffs' established a cognizable constitutional deprivation of their First Amendment rights, the Court proceeds

to determine whether the defendants can be held liable for such alleged harm.

### D. Supervisory Liability Under § 1983

Much of the defendants' argument focuses on the inability of the plaintiffs to identify defendants Barnes, Buffardi, and Elwell as being personally liable for the alleged acts of retaliation and harassment. In section 1983 claims, personal liability may be predicated upon the actions of the defendants in either their individual or supervisory capacity. Liability for a failure to supervise or train is premised on a belief that a supervisor is charged with safeguarding against constitutional violations by employees under his control. See *Haynesworth v. Miller,* 820 F.2d 1245, 1259 (D.C.Cir.1987). However, a finding that a supervisor is liable for wrongdoing does not necessarily require that the municipality be found liable because the supervisor's conduct may not reflect municipal policy. See *id.* However, a claim against a supervisory official can give rise to municipal liability if the supervisor is a policymaker in the area in which the challenged conduct arose. See *id.*

A defendant sued under § 1983 may not be held liable merely because he held a high position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Leonhard v. United States,* 633 F.2d 599, 621 n. 30 (2d Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). Rather, personal involvement in the constitutional violation on the official's part is required. *Black,* 76 F.3d at 74; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991).

The Second Circuit has construed "personal involvement" in the § 1983 context to mean either direct participation, failure to remedy a wrong after learning of it, creation of a policy or custom by the official under which unconstitutional practices occurred, gross negligence in managing subordinates, or deliberate indifference by failing to act on information alleging unconstitutional acts. *Black,* 76 F.3d at 74; *Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)); *Wright,* 21 F.3d at 501. A

showing of mere negligence on the official's part will not suffice. *Moffitt,* 950 F.2d at 886 n. 5 (citing *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)); *Wise v. New York City Police Department,* 928 F.Supp. 355, 368 (S.D.N.Y. 1996). It is uncertain, however, if the gross negligence standard is sufficient in light of the Supreme Court's decision in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). *See Moffitt,* 950 F.2d at 886 n. 5. Based on these standards, the Court now examines the liability of defendants Barnes, Buffardi, Elwell, and Schenectady County.

### a. Defendant Barnes

Plaintiffs concede that they are unable to identify Defendant Barnes as directly engaging in any of the complained acts of retaliation and harassment. Indeed, Barnes relies on this fact in denying any responsibility for the events that allegedly followed after each plaintiff reported instances of officer misconduct at the County Jail. This defense, however, overlooks the affirmative acts taken by Barnes to identify and disclose Jeffes as the disguised informer to his co-workers, and his failure to act after learning about the host of alleged retaliation and harassment that Jeffes, Keenan, and Carlos experienced after publicly reporting officer misconduct and cooperating in the federal investigation and subsequent prosecution.

After spending considerable effort in identifying Jeffes as the disguised officer that reported officer misconduct at the County Jail, Barnes showed a tape of the interview to many of Jeffes' co-workers. Buffardi Dep. at 57–58, 81–88; Barnes Dep. at 66; Jones Dep. at 67–69; Broderick Dep. at 48, Ex, 22; Jeffes Dep. at 11. This takes on added significance in light of Barnes' awareness that many officers were upset at Jeffes for lying about his involvement in reporting the alleged misconduct. Barnes Dep. at 332; Buffardi Dep. at 61. Barnes also made threats against Jeffes. Jeffes Dep. at 7, 11. He also received reports from other officers stating their concerns for the plaintiffs' safety and that radio communications were being hindered, and that continued harassment was

lodged against the plaintiffs. Broderick Dep. at 60; Barnes Dep. at 316; Marchinkowski Dep. at 64. Barnes, as Sheriff, was charged with responsibility for monitoring conduct in the jail, and disciplining those employees that violated the rules. Plaintiffs allege, however, that Barnes refused to conduct such an investigation or monitoring of officer misconduct. Although the record is less clear as to the nature, if any, of any investigation undertaken by Barnes, a reasonable fact-finder could infer that there was little chance that Barnes would act in light of the allegations that he initiated much of the acts of retaliation and harassment complained of by the plaintiffs. The complaints alleged by the plaintiffs reasonably should have prompted Barnes to conduct an investigation. *See Colon*, 58 F.3d at 873.

Examining plaintiffs' claims as a whole, this Court finds that a reasonable fact-finder could conclude that Barnes should have known that identifying Jeffes as the informer and subsequently failing to act when informed of numerous alleged instances of retaliation and harassment upon the plaintiffs, some of which threatened their safety, would continue to expose the plaintiffs to extreme hostility from their co-workers and make working conditions intolerable. Indeed, through his own monitoring of the daily activities at the jail, and reports of employee conflict and safety concerns communicated to him, Barnes "reasonably should have [been] prompted" to investigate and remedy such concerns. *Colon*, 58 F.3d at 873.

Officers Keenan and Carlos have alleged similar acts of retaliation and harassment. Barnes stated that Keenan "did not have any loyalty to the department and the sheriff," Giacumo Dep. at 10, and threatened Carlos by stating that, "you're gonna get yours," and "we're gonna get ya." Carlos Dep. at 58.

█ In short, plaintiffs have presented evidence that would create a triable issue of fact regarding Barnes' supervisory liability based on his direct participation in the alleged constitutional violations, a deliberate indifference or tacit authorization to such acts, and a failure to remedy the acts of retaliation and harassment of which he became aware. Therefore, the Court finds that the plaintiffs' allegations are sufficient to withstand Barnes' motion for summary judgment.

#### b. Defendant Buffardi

Buffardi participated in the considerable efforts made to identify Jeffes as the disguised officer on the taped interview. Buffardi Dep. at 36–40; 64–76. At the request of Barnes, Buffardi showed the tape to other correction officers. Buffardi Dep. at 81–82; Broderick Dep. at Ex. 22; Elwell Dep. at 115; Pollard Dep. at 54. This, by itself, is sufficient for a reasonable fact-finder to infer Buffardi's direct participation in the alleged wrongdoing. As Undersheriff, Buffardi, like Barnes, shared responsibility for the overall supervision of employee activities and was responsible for disciplining officers for acts of misconduct. Although made aware of the problems, through discussions with other officers and by his regular monitoring of activities within the jail, Buffardi allegedly failed to act. These problems were also discussed directly with Barnes. Barnes Dep. at 316–17; Buffardi Dep. at 166–68. Plaintiffs allege that Buffardi refused to investigate alleged acts of retaliation and harassment brought to his attention. Like Barnes, it is reasonable to infer that Buffardi had little incentive to remedy the wrongs alleged by the plaintiffs given his direct involvement in identifying Jeffes as the informer and disclosing this fact by subsequently showing the tape to Jeffes' co-workers.

In short, plaintiffs have presented evidence that would create a triable issue of fact as to Buffardi's supervisory liability based on his direct participation in the alleged constitutional violations, a deliberate indifference or tacit authorization of such acts, and a failure to remedy the acts of retaliation and harassment of which he became aware. Therefore, the Court finds that the plaintiffs' allegations are sufficient to withstand Buffardi's motion for summary judgment.

#### c. Defendant Elwell

Major Elwell, too, shared responsibility for monitoring employee conduct and investigating claims of officer misconduct that could

result in disciplinary action. It is reasonable for the plaintiffs to infer that Elwell would respond to their complaints of retaliation and harassment and attempt to remedy any employee conflict. Plaintiffs, however, allege that Elwell failed to act, thus demonstrating a tacit authorization for the alleged actions taken by plaintiffs' co-workers. Indeed, Elwell was made aware of some of these instances by other officers. Broderick Dep. at 53; Carlos Dep. at 47–48, 62.

While the record is unclear whether Elwell conducted any investigation into plaintiffs' claims, it is reasonable to infer that such concerns merited an investigation on Elwell's part. *See Colon,* 58 F.3d at 873. Because plaintiffs have alleged that Elwell had actual and constructive knowledge of acts of retaliation and harassment, there exists a triable issue of fact whether Elwell failed to act after learning of these acts, or demonstrated deliberate indifference to these claims by failing to act when made aware of them. A failure to act was likely to expose plaintiffs to continued hostility from other corrections officers. Therefore, the Court finds that the plaintiffs' allegations are sufficient to withstand Elwell's motion for summary judgment.

### E. Schenectady County

Recognizing that not every decision by a municipal employee automatically imposes liability on the municipality, courts have disallowed claims under section 1983 on a respondeat superior theory. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018. Because *Monell* and its progeny focus on responsibility for alleged wrongs, municipal liability does not attach unless the municipality's policies are the "moving force" behind the constitutional violations. *Board of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1389, 137 L.Ed.2d 626 (1997); *City of Canton,* 489

U.S. at 388, 109 S.Ct. 1197. Courts have had considerable difficulty, however, in determining whether particular decisions made by municipal officers represents municipal policy. Express acceptance by the County for the defendants' actions is not a prerequisite to the imposition of municipal liability. *See Weber v. Dell,* 804 F.2d 796, 802 (2d Cir. 1986), *cert. denied sub nom., County of Monroe v. Weber,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987) (noting that section 1983 preempts state law and a county can be liable for its established policies, custom, and practice).

The courts have articulated guidelines under which municipal liability may be imposed. These include: (1) an officially promulgated policy sanctioned or ordered by the municipality, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; (2) a pervasive custom or practice approved of by the municipality or which the municipality is aware or should be aware, *see City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; (3) a single act taken by the municipal employee who, as a matter of state law, has final policymaking authority with respect to the area in which the action is taken, *see McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 1736, 138 L.Ed.2d 1 (1997); *Praprotnik,* 485 U.S. at 129–30, 108 S.Ct. 915; *Pembaur,* 475 U.S. at 480–83, 106 S.Ct. 1292; or (4) where the failure of the municipality to train its employees rises to the level of deliberate indifference to the constitutional rights of others, *see City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197; *Walker v. City of New York,* 974 F.2d 293, 297 (2d Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). The plaintiff in a section 1983 claim bears the burden of establishing municipal liability. *See Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987); *Dominguez v. Beame,* 603 F.2d 337, 341 (2d Cir.1979), *cert. denied,* 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271 (1980).

### 1. Official Policy

▮ Plaintiffs have not presented any evidence to establish that a formal "policy statement, ordinance, regulation, or decision was officially adopted and promulgated" by Schenectady County authorizing acts of retaliation and harassment against those employees that exercised their First Amendment rights by publicly reporting officer misconduct. *Monell,* 436 U.S. at 689, 98 S.Ct. 2018. Accordingly, municipal liability cannot be established on this ground.

### 2. Approved Custom of Practice

▮ Plaintiffs also fail to offer any evidence of the existence of any widespread practice, express or otherwise, authorizing acts of retaliation and harassment in cases where employees exercise their First Amendment rights, that would establish a permanent or well settled custom or usage with equal force of law. *See Board of County Comm'rs,* 117 S.Ct. at 1388; *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142). Therefore, municipal liability cannot be established on this ground.

### 3. Municipal Employee with Final Policymaking Authority

▮ This ground provides the source of most of the contention and misunderstanding between the parties on the issue of municipal liability. This issue involves two questions: (1) whether the defendants were policymakers for the state or the county; and (2) whether the defendants had *final* policymaking authority for the municipality concerning the actions alleged to have caused the constitutional deprivation. *See McMillian,* 117 S.Ct. at 1736. These necessarily implicate questions of state law that must be decided by the Court. *See id.,* 117 S.Ct. at 1737; *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (citing *Praprotnik,* 485 U.S. at 124, 108 S.Ct. 915); *Meyers v. City of Cincinnati,* 14 F.3d 1115, 1120 (6th Cir.1994).

The Court notes that Schenectady County's potential liability for the actions of Sheriff Barnes has been already visited by another court within this district. *See O'Connor v. Barnes et al.,* 97 CV 1489 (N.D.N.Y. March 18, 1998). In *O'Connor,* the court found that Sheriff Barnes was a policymaker for Schenectady County and that he had final policymaking authority for the actions allegedly giving rise to the constitutional violations. *See id.* at 14–20. The *O'Connor* court, however, was deciding defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), and its decision was based on whether "it [was] clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* at 7–8 (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195). This Court, however, in deciding defendant's summary judgment motion, has the benefit of examining additional affidavits and depositions that were not previously available.

▮ The Supreme Court in *Pembaur* made a critical distinction when a municipal official exercising policymaking authority on behalf of the municipality does not necessarily rise to the level of *final* policymaking authority:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if the county employment policy was set by [an independent county board], only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Pembaur*, 475 U.S. at 484 n. 12, 106 S.Ct. 1292. Because a municipal official functions as a policymaker by the nature of his position, courts have required that such official exercise final policymaking authority in an area in order for the official's actions to represent official policy and bind the municipality. This standard attaches municipal liability only where the "decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481, 106 S.Ct. 1292. Notably, municipal liability would not be imposed even though the policymaker had discretion to act in a particular area. *See id.* at 482, 106 S.Ct. 1292. This distinction is critical in avoiding the imposition of municipal liability under a respondeat superior theory. The Court is mindful, however, that such final policymaking authority can be established by the single act of a municipal employee. *See id.* at 481, 106 S.Ct. 1292.

Schenectady County has stipulated that Sheriff Barnes was a policymaker for the County. *See* Attorney Aff. in Support of Motion for Summary Judgment at ¶ 17; *O'Connor*, 97 CV 1489 at 17. The Court therefore accepts this proposition. *Accord Isereau v. State*, 207 Misc. 665, 139 N.Y.S.2d 739, 743 (N.Y.Ct.Cl.1954), *aff'd*, 3 A.D.2d 813, 160 N.Y.S.2d 839 (4d Dept.1957) ("Though the office of Sheriff is organized under the authority of the State, a Sheriff is classified as a local officer ... [whose] duties are prescribed by county law."). The more difficult question, however, is whether Sheriff Barnes exercised final policymaking authority with respect those actions alleged to have violated the plaintiff's constitutional rights.

 In assessing whether a municipal official possesses final policymaking authority in a given area, the critical distinction "is between the establishment of policy and the exercise of discretion in enforcing existing policy." 1B SCHWARTZ & KIRKLIN, SECTION 1983 LITIGATION: CLAIMS AND DEFENSES at § 7.15. A municipal official that exercises discretion, whether it be in a constitutional or unconstitutional manner, in an area in which that official is not the final policymaker, cannot, by itself, establish municipal liability. *See Praprotnik*, 485 U.S. at 139–40, 108 S.Ct.

915 (Brennan, J., concurring); *Pembaur*, 475 U.S. at 481–82, 106 S.Ct. 1292. Accordingly, plaintiffs must demonstrate that Sheriff Barnes was acting as the final policymaker, and not merely exercising his discretion, in that aspect of municipal policy that caused the alleged constitutional deprivation. This requires the Court to determine what municipal policies were implicated by the actions allegedly taken by the Sheriff. Here, plaintiffs' claim is premised on their contention that the Sheriff was the final policymaker with respect to the acts of retaliation and harassment alleged by the plaintiffs.

The cases addressing this issue have made a distinction between policies involving law enforcement matters and those involving employment and personnel matters. *See McMillian*, 117 S.Ct. at 1734 (sheriff a final policymaker for the state with respect to law enforcement matters); *Jett*, 491 U.S. at 701, 109 S.Ct. 2702 (employee transfers); *Praprotnik*, 485 U.S. at 112, 108 S.Ct. 915 (director of local city agency not a final policymaker for matters involving retaliatory transfers or layoffs); *Pembaur*, 475 U.S. at 469, 106 S.Ct. 1292 (county sheriff and prosecutor could establish municipal policy with respect to law enforcement matters). In the present case, the plaintiffs allege that retaliatory actions were initiated and encouraged by Sheriff Barnes in response to plaintiffs' exercise of their First Amendment right of free speech. Indeed, plaintiffs allege that the retaliation and harassment occurred in the workplace and adversely affected the manner in which they carried out their assigned duties. These allegations fit squarely within the context of employment or personnel matters. *See Praprotnik*, 485 U.S. at 113, 108 S.Ct. 915. The Court must now determine whether the Sheriff was "speak[ing] with final policymaking authority" for Schenectady County in this area. *Jett*, 491 U.S. at 737, 109 S.Ct. 2702.

In a factual setting similar to the present case, the Supreme Court in *Praprotnik* dealt with plaintiff's allegations that his First Amendment rights were violated through a retaliatory transfer taken in response to plaintiff's appeal of a prior suspension. *See Praprotnik*, 485 U.S. at 116, 108 S.Ct. 915.

The Supreme Court characterized the retaliatory actions as involving matters of "personnel administration" and "employment policy," *id.* at 128–29, 108 S.Ct. 915, and found that the city officials were not authorized under the city charter to establish employment policy for the municipality, and were therefore merely exercising discretion rather than formulating municipal policy. *See id.* at 129–30, 108 S.Ct. 915. Moreover, the Supreme Court noted that those parties charged with final policymaking authority for such employment matters had not enacted any ordinance "designed to retaliate against ... similarly situated employees." *Id.* at 128, 108 S.Ct. 915.

■ While these cases provide general guidelines in which to operate, any final determination with respect to the challenged actions in the present case depends on applicable state and/or local law. *See id.* at 123, 108 S.Ct. 915. Plaintiffs, however, fail to establish, as a matter of law, that the Sheriff was acting in an area of municipal policy in which he was charged with final policymaking authority under applicable state or county law. Additionally, plaintiffs have not established that those persons responsible for municipal employment policy enacted an ordinance or adopted a custom or policy which permitted such retaliatory conduct. Accordingly, liability cannot be imposed, as a matter of law, on Schenectady County based on plaintiffs' claim that the Sheriff was acting as the final policymaker with respect to the actions alleged to have caused the constitutional deprivation.

### 4. Failure to Train

■ In *City of Canton,* 489 U.S. at 378, 109 S.Ct. 1197, the Supreme Court established deliberate indifference as the standard for imposing municipal liability for inadequate training. A municipality may be held liable for its deliberate indifference based on its affirmatively adopted policies and its failure to adopt a policy necessary to prevent probable constitutional violations by its employees. *See* 1B SCHWARTZ & KIRKLIN, SECTION 1983 LITIGATION: CLAIMS AND DEFENSES at § 7.8. The need for training must be " 'so obvious,' that the failure to do so could prop-

erly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197 (providing, as an example, training on the constitutional limitations of excessive force given the use of firearms by police officers). However, liability should not necessarily attach because the training program was negligently administered or where additional training would have avoided the challenged conduct. *See id.* at 391, 109 S.Ct. 1197. The Supreme Court set this standard high to avoid courts from engaging in a process where it is required to second-guess the merits of municipality training programs. *See id.* at 392, 109 S.Ct. 1197.

■ To establish a claim of municipal liability under section 1983 for a failure to train, the plaintiff must show that: (1) "policymaker must know 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizens's constitutional rights." *Walker,* 974 F.2d at 297.

■ Plaintiffs must first demonstrate that training was necessary to remedy an obvious and recurring problem. *See City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197; *Walker,* 974 F.2d at 297. Plaintiffs fail to meet this initial requirement. A failure to train employees for "rare or unforeseen events" can not rise to the level of deliberate indifference. *Walker,* 974 F.2d at 297. Schenectady County alleges that the conduct identified by the plaintiffs to be addressed by training had not occurred in the past twenty years. Hayner Aff. at ¶ 2. Other than generalized allegations, plaintiffs do not provide any evidence that Schenectady County was aware that the alleged retaliatory conduct had occurred or that employees had historically mishandled similar situations. *See Walker,* 974 F.2d at 297. Plaintiffs contend that because courts are "replete with claims of inmates alleging excessive force by guards," the Sheriff was effectively put on

notice that such events could occur at the jail. Pl. Mem. of Law at 26. This contention is over-generalized and fails to establish any awareness on the part of Schenectady County. Plaintiffs have presented no evidence showing that Schenectady County made a deliberate choice not to train its employees under circumstances alleged by the plaintiffs, and therefore cannot be said to rise to the level of municipal policy. *Accord City of Canton*, 489 U.S. at 388, 109 S.Ct. 1197. Any imposition of liability on the County under such circumstances would be tantamount to respondeat superior liability which the courts have clearly held is insufficient to establish section 1983 liability. *See Board of County Comm'rs*, 117 S.Ct. at 1388. The Court, therefore, finds plaintiffs' claims of a failure to train to be without merit.

Plaintiffs have not presented allegations sufficient to impose liability on Schenectady County for the actions taken by its municipal employees. Accordingly, the Court grants Schenectady County's motion for summary judgment and dismisses all claims therein against Schenectady County.

## III. CONCLUSION:

For all of the foregoing reasons, then, it is hereby **ORDERED,**

that defendants' motion for summary judgment seeking dismissal of plaintiffs' claims against defendants Barnes, Buffardi, and Elwell in their official capacities is **GRANTED,** and it is further

**ORDERED,** that defendants' motion for summary judgment seeking dismissal of plaintiffs' claims against defendants Barnes, Buffardi, and Elwell in their personal capacities is **DENIED,** and it is further

**ORDERED,** that Schenectady County's motion for summary judgment is **GRANTED,** dismissing the claims against Schenectady County.

**IT IS SO ORDERED.**