SHERIFF'S SILVER STAR ASSOCIATION OF OSWEGO COUNTY, INC., Tracie Gage, Deborah Spaulding--Gentile, Eleanor Lamay, Kimberly Lehtonen, Robin Niles, Rene Ouderkirk, Elaine Sampsell and Niesha Sheffield, Plaintiffs,

v.

COUNTY OF OSWEGO and Charles F. Nellis, Sheriff and Reuel A. Todd, Undersheriff, in their official capacities,[1] Defendants.

No. 97–CV–1880(GJD/NPM).

United States District Court, N.D. New York.

July 2, 1999.

1. At the time the complaint was filed, Nellis was Sheriff of Oswego County. Todd was subsequently elected Sheriff and assumed this position in January of 1999.

Satter & Andrews, LLP, Syracuse, NY (Mimi C. Satter, of counsel), for plaintiffs.

Petrone & Petrone, P.C., Utica, NY (Jill M. Barlow Paquette, of counsel), for Defendants.

## MEMORANDUM–DECISION & ORDER

McCURN, Senior District Judge.

Plaintiffs bring suit pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution and New York Executive Law § 296 challenging defendants' long-standing policy of sex-segregating certain jobs at the Oswego County Correctional Facility ("OCCF" or "Jail"). Presently before the court is plaintiffs' motion for partial summary judgment solely on the issue of defendants' liability. Defendants cross-move for a declaration that the challenged policy is valid.

## BACKGROUND

■ Plaintiffs, with the exception of Sheriff's Silver Star Association, are all either current or former full-time female correction officers ("CO's") at OCCF.[2] They are suing the County of Oswego

---

2. Sheriff's Silver Star Association is apparently the collective bargaining representative of all CO's employed by Oswego County. *See* Satter Aff. at ¶ 3. Despite the parties' lack of discussion on this point, because the eight individual plaintiffs have standing, the court need not consider whether the association also has standing to sue. *See, e.g., Clinton v. City of New York,* 524 U.S. 417, 118 S.Ct. 2091, 2100 n. 19, 141 L.Ed.2d 393 (1998); *Bowsher v. Synar,* 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986).

("County") and Charles Nellis and Reuel Todd, in their official capacities.[3]

OCCF has been in operation since January 4, 1995. It has room for approximately 160 inmates, consisting of 105 cells for male inmates, 15 cells for female inmates and 40 beds in a dormitory for male inmate overflow or weekend incarcerations. The 105 male cells are divided into four housing units: Intake, where inmates spend the initial period of their incarceration; General Population, where most inmates spend the remainder of their incarceration; Special Management, where inmates in protective custody, on suicide watch, or with special needs are housed; and Maximum, where inmates who cause disciplinary problems are held. All female cells are in a single housing unit.

OCCF is staffed by approximately 60 CO's. Approximately seven or eight of the CO's are female. There are three shifts at OCCF; CO's working the day shift are assigned to one of twelve posts: Women's Housing, Intake, General Population, Special Management, Maximum, Booking, Escort, Master Control, Commissary, Recreation and On-duty Supervisor; when needed, the twelfth post, Dormitory, is staffed. During other shifts, when less CO's may be working, certain posts may be consolidated or unstaffed.

It is uncontested that female CO's are prohibited from assignment to five of the twelve posts, those where male inmates are housed. Likewise, male CO's are prohibited from staffing the single post where female inmates are housed. This prohibition, at minimum, prevents female CO's from assignment to approximately 40% of the potentially available positions within the jail. Moreover, plaintiffs argue that the County's requirement that a female CO be assigned to the Women's Housing Unit frequently deprives female CO's of the opportunity to be assigned to any of the seven gender-neutral posts unless more than one female is working during a shift, which is not always the case. It is this gender-based staffing policy which plaintiffs challenge.[4]

## DISCUSSION

The principles that govern summary judgment motions are well established.

[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the exis-

**3.** "Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' ... [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (internal citations omitted) (quoting *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Consequently, courts have dismissed official-capacity claims as unnecessary or redundant where similar claims were asserted against the entity. *See Jeffes v. Barnes*, 20 F.Supp.2d 404, 410 (N.D.N.Y.1998) (McAvoy, C.J.); *Snall v. City of New York*, 1998 WL 960296 (E.D.N.Y. 1998). As claims have been asserted which may subject the County to municipal liability, the court dismisses plaintiffs' official-capacity claims against Nellis and Todd.

**4.** Plaintiffs fail to specify for which time period they seek to hold the County liable. As plaintiffs limit their discussion to the County's policy of sex-segregating jobs in the new jail, and the County restricts its defense to the same, the court presumes plaintiffs only seek a determination of the County's liability from the date OCCF opened, January 4, 1995, onward. Even if this were not the case, it bears noting that the applicable limitations period for a § 1983 claim in New York is three years. *See Okure v. Owens*, 816 F.2d 45, 49 (2d Cir.1987), *aff'd*, 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). A narrow exception to this rule exists where a plaintiff can demonstrate a continuing violation. *See Doolittle v. Ruffo*, 1996 WL 159850, *13 (N.D.N.Y. 1996) (McCurn, S.J.). Plaintiffs' complaint was filed on December 22, 1997. Plaintiffs have not come forward with any allegation or evidence of a continuing violation. Thus, alternatively, plaintiffs may only hold the County liable for the at issue policy from approximately two weeks before the new jail began operations.

tence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### A. Municipal Liability

As an initial matter, twenty years ago "[t]he Supreme Court declared ... that individuals have a constitutional right under the equal protection clause to be free from sex discrimination in public employment." *Annis v. County of Westchester,* 36 F.3d 251, 254 (2d Cir.1994) (citing *Davis v. Passman,* 442 U.S. 228, 234–35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979)). Plaintiffs have properly brought such a claim under 42 U.S.C. § 1983. *See id.* ("sex discrimination[ ] is covered by § 1983.").

▮▮▮▮ Municipalities, including counties, can be liable under § 1983 if the municipality itself can be said to have been responsible for the constitutional violation. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018. Municipalities are not liable under a theory of respondeat superior; "[i]nstead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* The Supreme Court has articulated several ways under which a custom or policy may be established, and the municipality held liable. These include: (1) a formal policy, officially promulgated or adopted by the municipality, *see Pembaur v. City of Cin-*

*cinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality); *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; (2) a custom or practice so pervasive as to imply that the municipality approved it, *see City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; or (3) an action or decision by the municipal official responsible for the establishment of final policy, as a matter of law, in respect to the area in which the decision is taken, *see McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 1736, 138 L.Ed.2d 1 (1997); *Praprotnik,* 485 U.S. at 129–30, 108 S.Ct. 915; *Pembaur,* 475 U.S. at 480–83, 106 S.Ct. 1292.

Plaintiffs argue that the County can be held liable under any of the above theories; the County fails to contest this argument, and its papers are devoid of any argument as to municipal liability. Rather, the County rests its entire defense (and cross-motion) on the argument that the sex-segregation at issue is lawful. Moreover, plaintiffs' Statement of Material Facts maintains that it is the County that sex-segregates CO assignments. *See* Pls.' Statement of Material Facts at ¶ 4 ("[t]he County permits only female COs to be assigned to the Women's Housing Unit and permits only male COs to be assigned to units housing male inmates"). The County's response fails to controvert or deny this fact. Former Local Rule 7.1(f) states in pertinent part that "*[a]ll material facts set forth in the statement served by the moving party shall be deemed admitted unless controverted by the statement served by the opposing party.*" N.D.N.Y. L.R. 7.1(f) (emphasis in original).[5] Between its lack of opposition on the issue of

---

5. The Local Rules of this court were amended as of January 1, 1999. Although somewhat different than its predecessor, new Local Rule 7.1(a)(3) mandates the same result. It directs that *"[a]ny facts set forth in the [movant's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the*

*opposing party."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). While Local Rule 7.1(a)(3)'s scope is broader, it is beyond cavil that the County's failure to dispute its municipal liability is a failure to controvert a *material* fact, thus falling under the more limited former Local Rule 7.1(f).

municipal liability, and its failure to deny plaintiffs' Statement of Material Facts in this regard, the court deems the County to have admitted that it is subject to municipal liability in the event the court finds the policy of sex-segregation unconstitutional.[6]

## B. Constitutionality of Sex-Segregating CO Assignments

■ Plaintiffs argue that the County's differential treatment of male and female CO's violates the Equal Protection Clause. The Supreme Court recently restated how courts should review challenges to classifications based on gender:

> Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is exceedingly persuasive. The burden of justification is demanding and it rests entirely on the State. The State must show at least that the [challenged] classification serves important governmental objectives and the discriminatory means employed are substantially related to the achievement of those objec-

tives. The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.

*United States v. Virginia,* 518 U.S. 515, 532–33, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996) (alteration in original) (internal quotation marks and citations omitted).

The parties do not dispute that the County policy discriminates against CO's on the basis of their gender. Thus, in the context of this motion, the burden lies with the County to show that its discriminatory policy furthers an important government objective, and then, if it has shown such an objective, that the policy is substantially related to the attainment of the objective. *See id.* The County has failed to meet this burden on both prongs.

The sole reason for sex-segregating housing post assignments is the errant belief by the County that New York law requires the same. *See* Nellis Dep. at 11–12 ("It's our practice at the facility to follow ... the correctional law."); Todd Dep. at 40 ("[I]t's pursuant to the correction law. It's a law.... It's not a policy,

---

6. Notwithstanding the County's admission of municipal liability, it should be noted that courts in this Circuit have found that New York counties can be liable for the decisions of the sheriff as final policymaker over issues related to jail operations. *See Weber v. Dell,* 804 F.2d 796, 802–03 (2d Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *O'Connor v. Barnes,* 1998 U.S. Dist. Lexis 3386, *11–21 (N.D.N.Y. 1998) (Kahn, J.); *but see Jeffes v. Barnes,* 20 F.Supp.2d 404, 419–21 (N.D.N.Y.1998) (McAvoy, C.J.) (holding that as to employment or personnel matters, the sheriff was not the final policymaker).

As Judge McAvoy noted in *Jeffes,* "[t]he cases addressing this issue have made a distinction between policies involving law enforcement matters and those involving employment and personnel matters." 20 F.Supp.2d at 420. *Jeffes* involved a § 1983 claim against a county for the sheriff's allegedly retaliatory treatment of deputies who reported misconduct of their co-workers in the Schenectady County Jail, which Judge McAvoy classified as fitting "squarely within the context of employment or personnel matters." *Id.* By contrast, in *Weber,* the Circuit clearly held that the sheriff was a final policymaker

with regard to the operation of the jail. "By ordering [strip] searches, the Sheriff established county jail policy, and defendants offer no authority for the argument that, as the highest ranking law enforcement official in the County, he was not entitled to do so." 804 F.2d at 803 (citations omitted).

In the present matter, the sex-segregation policy is more similar to *Weber* than *Jeffes.* Though a sheriff's decision to only allow CO's to guard same-gender inmates may affect the employment terms of the CO's, that decision affects far more than the employment or personnel policy of the jail. Rather, the decision involves the administration of the day-to-day activities of the jail, such as how inmates are to be guarded, and who is to guard them. Subject to the limitations of N.Y. Correction Law § 45(6), which authorizes the New York State Commission of Correction to promulgate rules and regulations as to the minimum standards of jails, custody and control of the jail is left to the sheriff. *See* N.Y. Correction Law § 500–c. Custody of the jail necessarily includes guarding those within it. In this matter, unlike *Jeffes* and similar to *Weber,* the sheriff is the final policymaker as to how inmates are guarded. Should that policy be unlawful, municipal liability may attach.

it's a law. It's been a law as long as I have been a police officer.").

Though both Nellis and Todd refer to "correction law" as mandating sex-segregation of CO assignments, it is clear that the state law forming the basis for their belief is N.Y. County Law § 652(2). This statute, effective August 2, 1994, states in relevant part that:

A female correction officer or female deputy sheriff who is authorized to perform correctional duties ... shall be in attendance in a correctional facility when females are confined in the correctional facility and shall, when deemed necessary by the sheriff or keeper of the jail to maintain the order and security of the facility, be in attendance in any housing unit where females are confined. A male correction officer or male deputy sheriff who is authorized to perform correctional duties ... shall be in attendance in a correctional facility when males are confined in the correctional facility and shall, when deemed necessary by the sheriff or keeper of the jail to maintain the order and security of the facility, be in attendance in any housing unit where males are confined.

N.Y. County Law § 652(2) (McKinney Supp.1999).

It is clear that nothing in the revised statute prohibits female CO's from being assigned to male housing units and vice-versa. Rather, New York law merely requires that a female CO be present somewhere within a jail when females are confined within the facility and a male CO to be present somewhere within a jail when males are confined within the facility.[7] *See* N.Y. County Law § 652(2); *Toth v. Allegany County Sheriff's Dep't*, No. 92–CV–520A, slip op. at 25 (W.D.N.Y. Aug. 4, 1995) (attached to Pls.' Mem. of Law Ex. A).

As Nellis and Todd offered only the justification that state law mandates the sex-segregation of CO assignments, plaintiffs moved for partial summary judgment, arguing that as a matter of law, this view was errant, and as such, could not possibly be the "exceedingly persuasive reason" for differential treatment of male and female CO's which the Supreme Court requires.

■ In opposition, the County now comes forward with the single affidavit of Todd which explains two new reasons for the sex-segregation of CO's. First, the policy purportedly accommodates inmate privacy by preventing CO's of the opposite sex from observing inmates showering, going to the bathroom, or undressing. *See* Todd Aff. at ¶ 10. Second, the policy purportedly prevents the possibility of sexual harassment or sexual harassment claims. *See id.* Thus, the County now argues for the first time that preservation of inmate privacy and prevention of sexual harassment are important governmental objectives, and that sex-segregating CO assignments is a policy substantially related to achieving these objectives. *See* Def. Mem. of Law at 7–8.

■ The court declines to decide whether or not these governmental objectives

---

7. Prior to August 2, 1994, § 652(2) was somewhat different, and may have formed the basis for Nellis' and Todd's belief that only same-gender CO's could be assigned to housing units. Former § 652(2) stated in relevant part that:

Each Sheriff shall [ ] appoint ... a reputable woman as matron to each jail, who shall have sole charge of the female prisoners and that portion of the jail in which female prisoners are detained.... The keeper or other male employee shall not have access to the section, department or room of the jail in which any female is detained, except in the company of such matron.... A matron shall at all times be in attendance when females are confined in the jail.

N.Y. County Law § 652(2) (McKinney 1991). Notwithstanding the validity of this former statute on equal protection grounds, which the court need not determine, it is significant that the statute did not prohibit females from guarding male prisoners. *See Toth,* slip op. at 25–26 (the old § 652(2) did not prohibit females from staffing posts within male housing units).

satisfy the demands of the Constitution. As the County's new justifications are contradictory to prior sworn testimony, the court disregards them in the context of this summary judgment motion. In doing so, the court follows the long-standing rule in the Second Circuit that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997) (quoting *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir.1996)). *Accord Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir.1995); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment"). As the Circuit noted some time ago,

> if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969).

Despite the County's protestations to the contrary, the Todd affidavit is directly contradictory to his prior deposition testimony. While Todd now claims in his affidavit that protection of inmate privacy and prevention of sexual harassment are the dual justifications for the challenged policy, his deposition testimony is devoid of any such justifications.[8] Rather, in his deposition, Todd testified unequivocally that state law was the *sole* reason the County sex-segregates CO assignments:

Q: Are there any posts that women cannot be assigned to?

A: The male housing units.

\*\*\*

Q: Is that pursuant to a written policy?

A: *No, it's pursuant to the correction law. It's a law.*

\*\*\*

A: *It's not a policy, it's a law. It's been a law as long as I have been a police officer.*

In the second cited passage, Todd was asked in his personal opinion whether sex-segregation of the CO's was necessary. *See* Todd Dep. at 45–46. Todd stated, among other things, that he would not want his daughter, if jailed, to be viewed by male CO's while getting dressed or undressed. *See id.* at 46. He concluded that "it would be my opinion [that] there are certain personal hygiene matters that should not be viewed by the opposite section [sic]." *Id.* Regardless of his personal opinion, Todd stated that correction law required the sex segregation and that "[t]he law says that is what it will be." *Id.* at 47. Thus, notwithstanding Todd's opinion on inmate privacy, it is clear he did not rely on the same for the at issue policy.

In the last cited passage, Todd was asked if any allegation of sexual harassment was ever made against a CO. *See* Todd Dep. at 55–56. This was only raised upon a direct question by plaintiffs' counsel; Todd never referred, either in the cited passage or elsewhere, to the single incident of sexual harassment as a justification for the challenged policy.

8. The County claims three passages from Todd's deposition support the new justifications for sex-segregating CO assignments. *See* Def.Mem. of Law at 2, 7. This court has thoroughly reviewed the cited passages of the deposition testimony to which the County refers, and they do not support, or even indicate, the justifications now propounded.

In the first passage, Todd stated that he would not enter the Women's Housing Unit unannounced. *See* Todd Dep. at 17–20. There was no testimony that this was motivated by a concern for inmate privacy or to prevent sexual harassment or claims of the same. Moreover, this passage is devoid of any discussion of the reasons for requiring sex-segregation of CO assignments, let alone that the reason for the same was either inmate privacy or prevention of sexual harassment. Instead, as Todd later explained, the sole reason that employees could not enter housing units of the opposite gender unannounced was his errant understanding of state law. *See* Todd Dep. at 57–58 ("Q: All these restrictions are pursuant to the state law? A: That's correct.").

Q: That men are not allowed to guard women in the housing units and vise [sic] versa?

A: *That's correct.*

\* \* \*

Q: Is the sole reason that the [C]ounty enforces [the sex-segregation policy] because of the County's understanding of the state law?

A: *That's correct.*

Q: *And there is no other reason other than your understanding of state law?*

A: *That's correct.*

Todd Dep. at 40–41 (emphasis supplied).

With the exception of Todd's affidavit, which contradicts his prior deposition testimony, no evidence before the court supports the County's contention that inmate privacy and concerns over sexual harassment were and are the reasons the County has and continues to sex-segregate CO assignments. The County cannot come forward now and try to raise an issue of fact by submitting a nugatory affidavit from Todd to repair the damaging and misguided statements that he and Nellis made. Todd's affidavit, consequently, to the extent that it contradicts his deposition testimony, is disregarded by the court.[9]

Having disregarded concerns over inmate privacy and sexual harassment as justifications for the County's policy of sex-segregation, the only remaining justification is state law. As discussed above, current County Law § 652(2) simply requires that when a jail holds inmates of both genders, at least one CO of each gender be present within the jail. Though § 652(2) does permit the sheriff to assign a same-gender CO to a specific housing unit, the statute neither mandates this result, nor prohibits the guarding of inmates by officers of a different gender.[10] The County misunderstood § 652(2) as prohibiting cross-gender assignments of CO's to housing units. A misunderstanding of state law cannot be a constitutional justification for violation of the Equal Protection Clause. The County has consequently failed to meet its burden on this summary judgment motion. Accordingly, plaintiffs' motion for partial summary judgment is granted.[11]

## CONCLUSION

For the aforementioned reasons, it is hereby

ORDERED and DECLARED that the policy of sex-segregating certain CO assignments at the Oswego County Correctional Facility on an errant view of state law violates 42 U.S.C. § 1983; and it is further

ORDERED that plaintiffs' motion for partial summary judgment on the liability of the County is GRANTED; and it is further

ORDERED that plaintiffs' official-capacity claims against Nellis and Todd are DISMISSED; and it is further

ORDERED that the County's cross-motion is DENIED as moot.

IT IS SO ORDERED.

---

9. Even if the court did not disregard the new justifications contained within Todd's affidavit as contradictory to his deposition testimony, it would disregard them as impermissible *post hoc* rationalizations invented in response to litigation. *See Virginia*, 518 U.S. at 533, 116 S.Ct. 2264.

10. To the extent the statute allows the sheriff to require the presence of a same-gender CO within a housing unit, the law requires this only when "deemed necessary ... to maintain the order and security of the facility[.]" County Law § 652(2). Clearly, the sheriff must exercise the discretion given to him by the statute in a manner consistent with constitutional mandates.

11. Inasmuch as the court grants plaintiffs' § 1983 motion, it need not, as plaintiffs concede, consider their state law claim. *See* Pls.' Mem. of Law at 16.