208 F.3d 49 (2nd Cir. 2000)
 CHRISTOPHER JEFFES, JOHN E. KEENAN, JR., and JERRY CARLOS, Plaintiffs-Appellants, v.
WILLIAM BARNES, Individually and as Sheriff of the County of Schenectady, HARRY BUFFARDI, Individually and as Undersheriff of the County of Schenectady, ROBERT ELWELL, SR., Individually and as an Employee of the County of Schenectady, JOHN DOES being unnamed Employees of the County of Schenectady, and THE COUNTY OF SCHENECTADY, Defendants-Appellees.
 Docket No. 98-9369
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: June 28, 1999
Decided: March 28, 2000
 
 Appeal from a partial final judgment of the United States District Court for the Northern District of New York, Thomas J. McAvoy, Chief Judge, granting summary judgment dismissing claims under 42 U.S.C. 1983 against municipality. See 20 F.Supp.2d 404 (1998).
 Vacated and remanded.[Copyrighted Material Omitted]
 KEVIN A. LUIBRAND, Albany, New York (Tobin & Dempf, Albany, New York, on the brief), for Plaintiffs-Appellants.
 RICHARD M. GERSHON, Albany, New York (Thorn & Gershon, Albany, New York, on the brief), for Defendant-Appellee County of Schenectady.
 Before: KEARSE, STRAUB, and POOLER, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Christopher Jeffes et al. appeal from a partial final judgment entered pursuant to Fed. R. Civ. P. 54(b) in the United States District Court for the Northern District of New York, Thomas J. McAvoy, Chief Judge, dismissing so much of their complaint, brought under 42 U.S.C. 1983 (Supp. III 1997), as asserted First Amendment claims against defendants William Barnes, Harry Buffardi, and Robert Elwell, Sr. (collectively the "individual defendants"), in their official capacities, and defendant County of Schenectady (the "County" or "Schenectady County") for retaliating against plaintiffs for reporting to the public and to federal investigative authorities certain wrongdoing by County employees. The district court granted summary judgment dismissing these claims on the ground that plaintiffs failed to adduce evidence sufficient to permit an inference that their rights were violated as a result of a County policy or custom. On appeal, plaintiffs contend principally that, in so concluding, the district court failed to draw all permissible inferences in their favor, and that the court should have concluded that Barnes was the County's policymaker with respect to the actions complained of. For the reasons that follow, we agree, and we therefore vacate the judgment and remand for further proceedings on the claims against the County and against the individual defendants in their official capacities, along with the undismissed claims that are not the subject of this appeal.
 
 I. BACKGROUND
 
 2
 The events at issue involved operations of the Schenectady County Jail ("Jail" or "County Jail"), which is run by the County's Sheriff's Department ("Department"). At the pertinent times, the individual defendants were supervisors in the Department. Barnes was the sheriff; Buffardi, the undersheriff, was his second-in-command; Elwell was a major, responsible for the Jail's day-to-day operations.
 
 
 3
 All of the plaintiffs were employees of the Department, working in the County Jail. Jeffes was a correction officer for several years beginning in 1979; in or about 1984, he achieved the rank of lieutenant after passing a civil service examination; in 1991 Barnes appointed Jeffes a provisional major. Jeffes ceased to work at the Jail in late 1994. Plaintiff John R. Keenan, Jr., was a correction officer from 1982 until mid-1996. Plaintiff Jerry Carlos, a correction officer since 1981, remained so employed through the time this suit was begun.
 
 
 4
 In April 1994, there occurred an alleged incident of flagrant abuse of inmates at the Jail by certain correction officers. Jeffes publicly criticized the assaults; he, Keenan, and Carlos, among others, assisted in an investigation conducted by the Federal Bureau of Investigation ("FBI"). The present lawsuit arises out of a campaign of harassment, threats, and intimidation by members of the Department against plaintiffs in retaliation for their public disclosures and their assistance in the investigation. Construed in the light most favorable to plaintiffs, with all reasonable inferences drawn in their favor, the evidence as reflected in affidavits and dozens of depositions showed the following.
 
 
 5
 A. The April 29, 1994 Inmate Beatings and the Official Responses
 
 
 6
 At the County Jail on April 29, 1994, apparently in response to an incident the previous day in which Jail officers had been attacked by several inmates, a group of guards inflicted severe physical abuse on seven inmates at the Jail. The abuse occurred while the inmates were being transported one-by-one from a new jail building to a special housing unit in the old building. During the transfer, the inmates were dragged, thrown, kicked, punched, and otherwise beaten while naked, handcuffed, and shackled. Officer William Leguire, for example, allegedly threatened to kill one inmate and stood on his face.
 
 
 7
 According to some witnesses, some of the inmate abuse occurred in the presence of Jail supervisors, including Sheriff Barnes. One lieutenant, for example, saw officers throw an inmate into an elevator and then beat him as he lay in a fetal position; as this was occurring, Sheriff Barnes looked on, said that the officers should "'act in a professional manner,'" and smiled. (Deposition of David Monroe at 29.)
 
 
 8
 Keenan and Carlos were among the witnesses to the beatings. When Carlos reported the incident he had seen to several superior officers, some of them responded there was nothing they could do and that Sheriff Barnes and Undersheriff Buffardi were aware of what had happened. When Carlos reported the incident directly to Sheriff Barnes, Barnes responded "'Well, OJ, you know, sometimes it just has to be,'" or "'You just have to do what you got to do.'" (Deposition of Jerry Carlos ("Carlos Dep.") at 37.) In a conversation with correction officer Christopher O'Connor some weeks later, Sheriff Barnes, with an air of pride, described the incident as "'great.'" (Deposition of Christopher O'Connor ("O'Connor Dep.") at 52.)
 
 
 9
 Major Jeffes was not on duty on April 29, but he received reports of the incident thereafter from several officers. Although official Jail policy required Jeffes to relay the reports of inmate abuse to his superiors, Jeffes decided that any such report would be futile, since he had been informed that Sheriff Barnes and Undersheriff Buffardi had known of and encouraged the beatings. Jeffes warned certain officers that the beatings could have serious repercussions for the officers involved, that the FBI would likely investigate the matter, and that officers should not lie under oath about the incident.
 
 
 10
 In July 1994, the beaten inmates filed notices of claim against the County, implicating several Jail officials including Sheriff Barnes. In the fall of 1994, a television news program featured an investigative report on the April 29 incident (the "news report"). As part of that news report, Jeffes gave an on-camera interview, but with his voice and appearance disguised, describing the seriousness of the abuse and implicating Sheriff Barnes in the incident. Jeffes had insisted on anonymity because he believed that if he were identified as the speaker he would "be labeled a rat and a snitch." (Deposition of Christopher Jeffes ("Jeffes Dep.") at 110.)
 
 
 11
 In late 1994, a federal investigation into the April 29 incident was begun. Jeffes met with FBI agents and conveyed to them much of the information he had learned regarding the inmate beatings. Keenan and Carlos too agreed to cooperate with the FBI, as did other officers, and all three plaintiffs testified in grand jury proceedings. The federal investigation led to various criminal charges, including an indictment against four officers. Keenan and Carlos, inter alios, testified at their trial, which was held in July 1996. Those four officers were eventually acquitted. A fifth officer pleaded guilty to a charge of use of excessive force.
 
 
 12
 B. The "Code of Silence" and the Retaliations
 
 
 13
 Major Elwell, at his deposition, testified that there is a "code of silence" at the Jail and that officers who report wrongdoing by fellow officers face severe ostracism. (Deposition of Robert D. Elwell ("Elwell Dep.") at 153-54.) Elwell testified, "I work within it ever [sic] day." (Id. 153.) He recalled another case in which an officer had breached the code of silence and had suffered such harsh ostracism that the officer either was or was nearly forced to resign. Correction officer Stanley Marchinkowski testified that in the wake of the April 29, 1994 inmate beatings, a representative of the Jail officers' labor union told several officers that "'as far as any investigation goes, anyone who turns in an officer is a rat, a snitch,'" and that "everybody had to stick together." (Deposition of Stanley Marchinkowski at 53.) O'Connor testified that when Sheriff Barnes commented to him on the April 29 incident, describing it as "'great,'" O'Connor expressed his disagreement, but Barnes stated that the officers needed to "stick[] together." (O'Connor Dep. at 52-53.)
 
 
 14
 After the federal investigation began, officers who were believed to have cooperated were subjected to numerous forms of harassment and intimidation by unidentified fellow officers. Plaintiffs and some half-dozen other targeted officers were, for example, incessantly depicted as "rats" and "snitches" on posters and in graffiti scrawled on walls in the Jail's hallways and bathrooms or on their lockers; they were subjected to name-calling in public areas and over walkie-talkies; they received harassing telephone calls; and they received outright threats of physical harm. The harassment of Keenan became unrelenting after he testified at the criminal trial of the four indicted officers. After Carlos testified at that trial, Sheriff Barnes himself, on at least two occasions, called Carlos "'Rat'" and "'Snitch,'" and told Carlos, "'You're gonna get yours,' and 'We're gonna get []ya.'" (Carlos Dep. at 58.)
 
 
 15
 The retaliation against Jeffes began in late 1994 immediately after the broadcast of the news report. Undersheriff Buffardi testified that the correction officers were very "angry" about the broadcast and that tensions among them were running high. (Deposition of Harry Buffardi at 61; see also Deposition of William Barnes ("Barnes Dep.") at 68 ("everybody was talking about it").). Buffardi had made a home videotape of the interview, and he and Barnes repeatedly reviewed the tape in the training room at the Jail. Both immediately suspected that Jeffes was the officer on the tape, and Barnes promptly took away Jeffes's administrative and supervisory responsibilities. When Jeffes inquired as to the reason, Barnes's only explanation was "'[p]eople do talk, Chris, and you know what this is about.'" (Jeffes Dep. at 6.)
 
 
 16
 Sheriff Barnes and Undersheriff Buffardi also took steps to determine with greater certainty the identity of the officer on the news report. As instructed by Barnes, Buffardi went to an air force base in another county to have the videotape enhanced and analyzed using advanced military equipment. These efforts resulted in the preparation of an enhanced tape of the audio portion (the "audio tape") that made it apparent that the voice of the officer was that of Jeffes. Buffardi later also obtained from the air force a voice-print analysis confirming that Jeffes was the officer on the tape.
 
 
 17
 Sheriff Barnes and Undersheriff Buffardi invited other officers to watch Buffardi's videotape; Barnes and Buffardi also subsequently played for officers the audio tape that clarified that the speaker was Jeffes. The officers who were invited by Sheriff Barnes and Undersheriff Buffardi included Leguire and correction officer Andrew Jones, both of whom were alleged to have participated in the April 29 inmate abuse. Correction officer John D. Broderick testified that Leguire urged everyone to "go upstairs and view the tape to see who it really was." (Broderick Deposition at 59.)
 
 
 18
 Broderick testified that, at the time, he believed that Barnes's screening of the videotape of the news report and exposure of Jeffes as the interviewed officer were likely to so inflame other officers as to pose a serious threat to Jeffes's life. Jeffes testified that several officers expressed to him their concern that he was in danger of physical harm if he continued to work at the Jail.
 
 
 19
 In the wake of Sheriff Barnes's invitations to officers to view the enhanced videotape of Jeffes's interview, Jeffes was subjected to numerous threats and other acts of harassment and intimidation. He received up to 20 menacing telephone calls a day, during which he could hear background noises revealing that the calls were coming from the Jail. Jeffes was also subjected to various types of retaliation in addition to the acts described above. For example, Jeffes's radio communications were subjected to interference, so that each time he tried to use his walkie-talkie, "another officer would click on and thus 'step on' [his] communication," thereby placing Jeffes "in the position of not being able to call for help" and endangering his life. (Affidavit of Christopher Jeffes dated June 26, 1998 ("Jeffes Aff.") 7.) A poster was hung in the Jail depicting Jeffes with his eyes blacked out, and bearing the words "NOW MAYBE I CAN DIE." (Id. 4 & Ex.B.) Two unidentified men showed up at the back door of Jeffes's home and harassed his wife, intimating that Jeffes was likely to be injured because of his position at the Jail. Jeffes also experienced what he suspected were acts of vandalism at his home, exposing it to the risk of fire. By December 1994, Jeffes had become so anxious over the threats and harassment that he spent the nights on his living room couch, with a shotgun within arm's reach.
 
 
 20
 Jeffes began seeing a psychotherapist and ceased going to work. His subsequent application for disability benefits was denied, and his employment by the County was eventually terminated in August 1997. Keenan, also undergoing psychiatric care, left his post at the Jail in 1996 after a panic attack; he never returned. His application for disability benefits too was denied, and his employment by the County was formally terminated in July 1997.
 
 
 21
 C. The Partial Judgment of the District Court
 
 
 22
 In 1997, plaintiffs commenced the present 1983 action against the County and against Sheriff Barnes, Undersheriff Buffardi, and Major Elwell in their individual and official capacities, alleging that defendants had violated the First Amendment by retaliating against plaintiffs for speaking out against the inmate beatings and for cooperating with the federal government in its investigation. In seeking to impose liability on the County, plaintiffs contended that, as a matter of law, Barnes as County sheriff had final policymaking authority for the County with regard to Jail personnel and conditions, and that his instigation and command of the ongoing course of retaliation against plaintiffs was attributable to the County. They also argued that the retaliation against them was the result of Sheriff Barnes's deliberate indifference to their First Amendment rights, as reflected in, inter alia, his failure to supervise or train officers at the Jail in order to protect plaintiffs from an obvious threat of retaliation.
 
 
 23
 Following discovery, defendants moved for summary judgment dismissing the complaint. With respect to the claims asserted against them in their individual capacities, the individual defendants argued principally that there was no evidence that any of the named defendants was personally involved in the alleged harassment and intimidation. With respect to the claims asserted against the County and the individual defendants in their official capacities (collectively the "claims against the County"), defendants contended that plaintiffs could not establish a First Amendment violation and that, in any event, under Monell v. Department of Social Services, 436 U.S. 658, 694 (1978), the County could not be held liable because plaintiffs had not shown that any such violation was caused by a County policy or custom. Defendants argued that plaintiffs had not identified any formal policy that caused the alleged violations, that there was no evidence that Sheriff Barnes acted within his policy making authority in directing subordinates to retaliate against plaintiffs, and that there was no evidence of a widespread or permanent custom of retaliation against correction officers who reported inmate abuse. The County further argued that the evidence did not show that the retaliation against plaintiffs was a result of the County's failure to train or supervise its correction officers.
 
 
 24
 In an opinion reported at 20 F. Supp.2d 404 (1998), the district court denied the individual defendants' motion to dismiss the claims asserted against them in their individual capacities, but granted the motion to dismiss the claims against the County, including those asserted against the individual defendants in their official capacities. With regard to individual liability, the court denied the motion to dismiss because the evidence showed sufficient personal involvement given the
 
 
 25
 affirmative acts taken by Barnes to identify and disclose Jeffes as the disguised informer to his co-workers, and his failure to act after learning about the host of alleged retaliation and harassment that Jeffes, Keenan, and Carlos experienced after publicly reporting officer misconduct and cooperating in the federal investigation and subsequent prosecution.
 
 
 26
 20 F. Supp.2d at 416. The court went on to note that
 
 
 27
 [a]lthough the record is less clear as to the nature, if any, of any investigation undertaken by Barnes, a reasonable fact-finder could infer that there was little chance that Barnes would act in light of the allegations that he initiated much of the acts of retaliation and harassment complained of by the plaintiffs.
 
 
 28
 Id. at 417. The court thus concluded that there was
 
 
 29
 a triable issue of fact regarding Barnes' supervisory liability based on his direct participation in the alleged constitutional violations, a deliberate indifference or tacit authorization to such acts, and a failure to remedy the acts of retaliation and harassment of which he became aware.
 
 
 30
 Id.
 
 
 31
 As to the claims against the County, however, the district court concluded that plaintiffs had not presented evidence that the alleged harassment should be attributable to the County. The court reasoned that the retaliatory actions taken against plaintiffs "occurred in the workplace and adversely affected the manner in which they carried out their assigned duties" and therefore "fit squarely within the context of employment or personnel matters," and it found that although Sheriff Barnes possessed some discretion in running the Jail, he did not "speak[] with final policymaking authority for Schenectady County in th[e] area" of "municipal employment policy." Id. at 420, 421 (internal quotation marks omitted). The court stated that the fact that "the Sheriff was effectively put on notice that such [retaliatory] events could occur at the jail .... fails to establish any awareness on the part of Schenectady County." Id. at 421-22.
 
 
 32
 The court found that there was not sufficient evidence to establish
 
 
 33
 any widespread practice, express or otherwise, authorizing acts of retaliation and harassment in cases where employees exercise their First Amendment rights, that would establish a permanent or well settled custom or usage with equal force of law.
 
 
 34
 Id. at 419. The court also rejected plaintiffs' contention that the harassment was the result of the County's failure adequately to train or supervise other correction officers, given the lack of "any evidence that [the] County was aware that the alleged retaliatory conduct had occurred or that employees had historically mishandled similar situations." Id. at 421.
 
 
 35
 The court eventually entered a Rule 54(b) certification with respect to the claims against the County, and a partial final judgment dismissing those claims was entered. This appeal challenges that dismissal.
 
 II. DISCUSSION
 
 36
 On appeal, plaintiffs contend principally that the district court (a) imposed on them an inappropriate burden to showas a matter of law that Sheriff Barnes possessed final policymaking authority in the area involved in this suit, and (b) failed to draw all permissible inferences in their favor. Although we reject plaintiffs' first contention, we conclude that under state and local law, the sheriff of Schenectady County is the County's final policymaker with respect to most of the actions complained of here. And when all permissible factual inferences are drawn in favor of plaintiffs as the parties opposing summary judgment, see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), there are genuine issues to be tried as to whether the injuries of which plaintiffs complain were caused by decisions of Sheriff Barnes as policymaker.
 
 A. Municipal Liability Under 1983
 
 37
 In a suit under 42 U.S.C. 1983, a municipality may not be held liable on a theory of respondeat superior. See, e.g., Monell v. Department of Social Services, 436 U.S. at 694. It may,however, be held liable if the conduct that caused the unconstitutional deprivation was undertaken pursuant to
 
 
 38
 a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[,] ...[or] pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels.
 
 
 39
 Id. at 690-91. The municipality cannot properly be held liable in such an action unless the "injury was inflicted by [its] 'lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" St. Louis v. Praprotnik, 485 U.S. 112, 121-22 (1988) (plurality opinion) (quoting Monell, 436 U.S. at 694).
 
 
 40
 Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved. See, e.g., Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989); Praprotnik, 485 U.S. at 123-25 (plurality opinion). It does not suffice for these purposes that the official has been granted discretion in the performance of his duties. See, e.g., id. at 127. "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to 1983 liability." Id. at 123 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion)).
 
 
 41
 Whether the official in question possessed final policymaking authority is a legal question, see, e.g., Jett, 491 U.S. at 737; Praprotnik, 485 U.S. at 124 (plurality opinion), which is to be answered on the basis of state law, see, e.g., McMillian v. Monroe County, 520 U.S. 781, 786 (1997) (proper "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law"); Jett, 491 U.S. at 737; Praprotnik, 485 U.S. at 123 (plurality opinion). "[T]he relevant legal materials, includ[e] state and local positive law, as well as custom or usage having the force of law." Jett, 491 U.S. at 737 (internal quotation marks omitted). The matter of whether the official is a final policymaker under state law is "to be resolved by the trial judge before the case is submitted to the jury." Id. (emphasis in original).
 
 
 42
 Most important for this appeal, the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be "responsible under state law for making policy in that area of the [municipality's] business." Praprotnik, 485 U.S. at 123 (emphasis added); see, e.g., Jett, 491 U.S. at 737 (must "have the power to make official policy on a particular issue") (emphasis added); Pembaur, 475 U.S. at 481 (plurality opinion) (must "possess[] final authority to establish municipal policy with respect to the action ordered") (emphasis added). Thus, the court must "ask whether [the] governmental official [is a] final policymaker[] for the local government in a particular area, or on [the] particular issue" involved in the action. McMillian, 520 U.S. at 785.
 
 
 43
 In sum, the question of whether a given official is the municipality's final policymaking official in a given area is a matter of law to be decided by the court. Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law. We thus reject plaintiffs' contention that the district court erred in imposing that burden on them; and we turn to the question of whether, as to the particular area at issue here, the burden was met.
 
 
 44
 B. The Authority of the Schenectady County Sheriff
 
 
 45
 The County contends that, although the sheriff is its final policymaker with respect to matters of law enforcement, he has no final policymaking authority with respect to matters of "personnel." (County brief on appeal at 18-19.) In granting summary judgment in favor of the County, the district court agreed that the sheriff has no such authority with respect to "municipal employment policy." 20 F.Supp.2d at 421. The court found the present case to be similar to "Praprotnik [which] dealt with plaintiff's allegations that his First Amendment rights were violated through a retaliatory transfer" to a new position, 20 F.Supp.2d at 420. It noted that the Praprotnik Court had
 
 
 46
 characterized the retaliatory actions as involving matters of 'personnel administration' and 'employment policy,' [485 U.S.] at 128-29, ... and found that the city officials were not authorized under the city charter to establish employment policy for the municipality, and were therefore merely exercising discretion rather than formulating municipal policy.
 
 
 47
 20 F.Supp.2d at 421.
 
 
 48
 We view the district court's analysis in terms of general "personnel" and "employment" matters as insufficient to identify the policymaker with respect to the "particular issue" involved here, McMillian, 520 U.S. at 785. The principal area in question in this suit involves the duties and obligations of the sheriff's staff members toward each other with respect to their exercise of First Amendment rights in breach of the Jail's code of silence. The following review of New York State ("State") law leads us to the conclusion that the Schenectady County sheriff was the County's final policymaker with respect to most of the conduct that plaintiffs challenge.
 
 
 49
 Under New York law, the sheriff of Schenectady County, as in most of the State's counties, is an elected official. See N.Y. Const. art. XIII, 13(a) (McKinney Supp. 1999); N.Y. County Law 400, subd. 1 (McKinney 1991). In addition to requiring the sheriff to "perform such additional and related duties as may be prescribed by law and directed by the board of supervisors or the county legislature," N.Y. County Law 650, subd. 1 (McKinney 1991), State law specifies that, except in two counties not relevant here, "[e]ach sheriff ... shall have custody of the county jails," N.Y. Correct. Law 500-c (McKinney Supp. 1999).
 
 
 50
 "In addition to the statutory powers and duties which a Sheriff now has[,] he also has those duties which were fixed at common law and which have not been abrogated by statute." Isereau v. Stone, 207 Misc. 941, 948, 140 N.Y.S.2d 585, 592 (N.Y. Sup. Ct. 1955), aff'd in part, rev'd in part on other grounds, 3 A.D.2d 243, 160 N.Y.S.2d 336 (4th Dep't 1957). "The powers, duties and obligations of a Sheriff" under common law, as under 500-c of the Correction Law, include the "care and maintenance of the county jail and its inmates." Id. at 949, 140 N.Y.S.2d at 593-94 (internal quotation marks omitted).
 
 
 51
 Matters pertaining to inmate conditions at the local jails, such as inmate care, custody, discipline, health, safety, employment, and grievances, are subject to some supervision and control by officials and agencies of State, rather than county, government. See N.Y. Correct. Law 45 (McKinney 1987). For example, the State Commission of Correction ("Correction Commission") has the power and the duty to, inter alia,
 
 
 52
 [v]isit, inspect and appraise the management of correctional facilities with specific attention to matters such as safety, security, health of inmates, sanitary conditions, rehabilitative programs, disturbance and fire prevention and control preparedness, and adherence to laws and regulations governing the rights of inmates.
 
 
 53
 Id. 45, subd. 3. The Correction Commission is required to "[p]romulgate rules and regulations establishing minimum standards for the care, custody, correction, treatment, supervision, discipline, and other correctional programs for all persons confined in correctional facilities." Id. subd. 6. If, in the judgment of the Correction Commission, there is "an imminent danger to the health, safety or security of the inmates or employees of [a] correctional facility or of the public," it may place a monitor in the facility. Id. subd. 7. The Correction Commission may also, if it believes necessary, establish a training program for jail personnel "[f]or the purpose of providing for adequate care, custody, correction, treatment, supervision, discipline and other correctional programs for all persons confined in correctional facilities." Id. subd. 9; see also id. subd. 9-a (for the same purposes, Correction Commission is to "promulgate rules and regulations for the certification of parttime local correctional officers employed by local correctional facilities who have satisfactorily completed an in-service correctional training program sponsored by the local correctional facility"). However, nothing in these provisions, informs or circumscribes the sheriff's authority with respect to the duties and obligations of his staff members toward each other.
 
 
 54
 With regard to the sheriff's authority over his staff, New York law provides that "[t]he sheriff may ... appoint keepers, guards, clerks and employees as may be authorized by the board of supervisors and such appointees shall serve during his pleasure." N.Y. County Law 652, subd. 2 (McKinney Supp. 1999). This power of appointment and termination is somewhat circumscribed by the current version of the New York Constitution, which has the effect of placing a sheriff's appointees under the civil service system. Prior to 1990, the State Constitution provided that "the county shall never be made responsible for the acts of [its] sheriff." N.Y. Const. art. XIII, 13(a) (McKinney 1987), amended by N.Y. Const. art. XIII, 13(a) (McKinney Supp. 1999). As a result of that provision, a sheriff's appointees were considered to be employees of the sheriff himself, rather than of the city or county in which he operated, see, e.g., Enstrom v. City of New York, 258 A.D. 672, 676, 17 N.Y.S.2d 964, 968 (2d Dep't 1940); Reck v. County of Onondaga, 51 Misc.2d 259, 261, 273 N.Y.S.2d 146, 150 (N.Y. Sup. Ct. 1966), and most were regarded as beyond the scope of the civil service system, see, e.g., Flaherty v. Milliken, 193 N.Y. 564, 86 N.E. 558 (1908), superseded by N.Y. Const. art. XIII, 13(a) (McKinney Supp. 1999); Grifenhagen v. Ordway, 218 N.Y. 451, 113 N.E. 516 (1916), superseded by N.Y. Const. art. XIII, 13(a) (McKinney Supp. 1999). After the State Constitution was amended in 1990 to delete the provision relieving counties of liability for the acts of their sheriffs, see N.Y. Const. art. XIII, 13(a) (McKinney Supp. 1999), the amendment was interpreted by the State legislature and the State courts to mean that all sheriffs' employees are to be included in the civil service system. See, e.g., N.Y. Civ. Serv. Law 59, subd. 1 (legislative finding that the 1990 amendment to the New York State constitution "brings appointees of a county sheriff into the classified service of the civil service"); Thoubboron v. New York State Department of Civil Service, 79 N.Y.2d 982, 584 N.Y.S.2d 433 (1992), aff'g 175 A.D.2d 443, 572 N.Y.S.2d 494 (3d Dep't 1991).
 
 
 55
 According to Schenectady County Manager Robert D. McEvoy, the functions of the County's Civil Service Commission with respect to appointments by the sheriff consist of "what Civil Service Commissions normally do." (Deposition of Robert D. McEvoy ("McEvoy Dep.") at 19.). Referring to the person who was personnel administrator for the County, McEvoy testified as follows:
 
 
 56
 He's the staff to the Civil Service Commission as they do testing, as they do job descriptions, job placements, job categories, whether they're examined or competitive, non-competitive, that's what Civil Service Commissions normally do, he directs the staff; then his role as Personnel Director, he does recruiting, he does labor contract negotiations, he does all the matters that go along with the labor contract administration, he also runs the welfare, the work programs that we have, because we have all that merged together in one unit, he supervises that because that's employment, we have all employment activity in one place.
 
 
 57
 (Id.) None of these areas within the normal scope of civil service supervision has any bearing on the existence of a code of silence at a correctional facility or the custom of enforcing that code by harassing and intimidating jail staff members who exercise their rights under the First Amendment to reveal wrongdoing by fellow workers.
 
 
 58
 Nor does local County law provide any indication that there is any final policymaker other than the Schenectady County sheriff with respect to operations at the Jail. The Schenectady County Manager is the municipality's chief executive official, chosen by the County legislature. See Charter of County of Schenectady 3.00. The County Manager "appoints" and "[e]xercises supervision and control" over "the heads of all departments ... except such officers required to be elected and their subordinates." Id. 3.01, subd. 2-3 (emphasis added). Since under State law the sheriff is required to be elected, he and his subordinates, as a matter of law, are not controlled or supervised by the Schenectady County Manager.
 
 
 59
 Nor is the sheriff, or his management of his subordinates, controlled or supervised by the County Manager in practice. In his deposition in this case, County Manager McEvoy, far from suggesting that the County supervised the sheriff in the operation of the Jail, testified that the County Manager's office would meet with the sheriff's staff only as desired by the sheriff and would never give any substantive direction. "[W]e are a service organization to the jail and our people meet with him or his agents because we are just servicing .... Since it's strictly a service function, there is no need for me to meet with him, unless he wanted to ...." (McEvoy Dep. at 20.) The County Manager stated that he would "[n]ever, never" have "substantive conversations" with Sheriff Barnes about the sheriff's work because the sheriff is a "constitutional officer." (Id. at 21.) Citing the advice he had received "many times" from the County's attorneys with respect to the sheriff (id. at 21-22), the County Manager testified, "I have nothing to do with his work responsibility, he's autonomous.... He runs the jail on his own ...." (Id. at 21.) Although the County argues that McEvoy was referring only to the sheriff's law enforcement function (see, e.g., County brief on appeal at 18), that argument is belied by the testimony itself. With respect to the sheriff and "jail operations," McEvoy stated succinctly, "he's in charge and has the authority for the jail, which we do not ...." (Id. at 15.)
 
 
 60
 In sum, State law requires that the Schenectady County sheriff be elected; County law provides that elected officials are not subject to supervision or control by the County's chief executive officer; there is only routine civil service supervision over the sheriff's appointments; State law places the sheriff in charge of the Jail; and the County's chief executive officer, advised by the County's attorneys, treats the sheriff, insofar as Jail operations are concerned, as "autonomous."
 
 
 61
 We could agree with the view that the sheriff is not the final policymaker for purposes of 1983 analysis if the complaint were simply that plaintiffs had been subjected to unwarranted formal discipline or changes in job assignments. But their claims go farbeyond these routine classes of personnel actions within the domain of a civil service commission. The bulk of plaintiffs' claims center on harassment, intimidation, threats, and endangerment of their lives. The County has pointed us to no provision of State or local law that requires a sheriff to answer to any other entity in the management of his jail staff with respect to the existence or enforcement of a code of silence. We conclude that Sheriff Barnes was, as a matter of law, the County's final policymaking official with respect to the conduct of his staff members toward fellow officers who exercise their First Amendment rights to speak publicly or to inform government investigators of their co-workers' wrongdoing.
 
 
 62
 C. Summary Judgment on the Issue of Causation
 
 
 63
 The issue of whether the relevant conduct of the pertinent policymaking official caused the injury of which the plaintiff complains is a question of fact for the jury:
 
 
 64
 Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see Monell, 436 U.S., at 661, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.
 
 
 65
 Jett, 491 U.S. at 737 (emphasis omitted). A plaintiff may prove the causation element by showing either that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal rights, see id., or that while the policymaker himself engaged in "facially lawful ... action," he indirectly caused the misconduct of a subordinate municipal employee, Board of the County Commissioners v. Brown, 520 U.S. 397, 405-07 (1997). Because respondeat superior liability is not permissible, however, the courts must apply "rigorous standards of culpability and causation ... to ensure that" the indirect-causation theory not result in the municipality's being "held liable solely for the actions of its employee." Id. at 405; see, e.g., City of Canton v. Harris, 489 U.S. 378, 388-92 (1989).
 
 
 66
 With that caveat, it is well established that a municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." Jett, 491 U.S. at 737. Thus, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision-maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Brown, 520 U.S. at 404; see also Sorlucco v. New York City Police Department, 971 F.2d 864, 871 (2d Cir. 1992) (municipality may be held liable where the unconstitutional conduct of subordinate employees is "so manifest as to imply the constructive acquiescence of senior policy-making officials").
 
 
 67
 Further, municipal liability may be premised on the municipality's failure to train its employees "where that ... failure to train reflects deliberate indifference to ... constitutional rights." City of Canton v. Harris, 489 U.S. at 392. Proof of deliberate indifference is a sine qua non for the imposition of liability on this basis. See id. at 389 ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under 1983."). The Harris Court explained that
 
 
 68
 [i]t may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.
 
 
 69
 Id. at 390 (footnote omitted). See also Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) ("To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious."); Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 123 (2d Cir. 1991) (deliberate indifference may be shown by "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges" that its employees were violating citizens' constitutional rights).
 
 
 70
 In the present case, the evidence adduced by plaintiffs sufficed to present several triable issues as to the existence of a municipal policy causing retaliation against plaintiffs for the exercise of their First Amendment rights to speak of the April 29, 1994 incident of inmate abuse. The reprisals included numerous menacing telephone calls from the Jail; a poster depicting Jeffes with his eyes blacked out, and bearing the words "NOW MAYBE I CAN DIE" (Jeffes Aff. 4 & Ex.B.); explicit threats of physical harm; a visit to Jeffes's home by unidentified men who told his wife that his Jail-connected acts were likely to cause Jeffes to be injured; acts that exposed Jeffes's home to the risk of destruction by fire; and the endangerment of Jeffes's life when harassing officers interfered with his attempts to communicate by walkie-talkie from the Jail's cell blocks. These acts were overtly critical of plaintiffs' breaches of the Jail's code of silence, and there was evidence from which the jury could infer that that code constituted Sheriff Barnes's standard operating procedure. Major Elwell, who was responsible for the Jail's day-to-day operations, testified that the code of silence existed and that he "work[ed] within it ever [sic] day." (Elwell Dep. at 153.) As a general matter under that code, officers were not to disclose wrongdoing by other officers. In the wake of the April 1994 inmate-abuse incident, Barnes himself told correction officer O'Connor that the officers should "stick[] together." (O'Connor Dep. at 52-53.) After Carlos testified at the trial of the four officers indicted in connection with that incident, Barnes called him a "'[r]at'" and a "'[s]nitch'" and promised retribution. (Carlos Dep. at 58.) Given Barnes's autonomy with respect to Jail operations, Elwell's testimony as to the constant adherence to the code of silence, and the other evidence that Barnes himself embraced and enforced that code, a jury could permissibly find that the code of silence was a practice or custom that constituted the municipality's standard operating procedure.
 
 
 71
 Further, there was ample evidence to permit a rational juror to find that Sheriff Barnes directly encouraged the acts of retaliation against plaintiffs for exercise of their First Amendment rights. After Carlos testified at the trial of the indicted officers, Barnes told him, "'You're gonna get yours,' and 'We're gonna get []ya'" (Carlos Dep. at 58). After viewing the videotape of the anonymous officer who spoke out about the inmate-abuse incident and suspecting that the officer was Jeffes, Barnes had promptly sought scientific confirmation of his suspicion and had invited other correction officers--including at least two who were officers alleged to have participated in the inmate abuse--to hear the enhancement clarifying that the officer who spoke out was Jeffes. The harassment, intimidation, and endangerment of Jeffes occurred largely in the wake of Barnes's confirmation and communication that the officer speaking out was Jeffes. The jury would be entitled to infer that Barnes's conduct was a direct cause of the harassment of plaintiffs.
 
 
 72
 Sheriff Barnes offered a contrary view as to his reason for seeking confirmation that the interviewed officer was Jeffes. He testified that he had sought to determine the officer's identity only because no one had ever told him there was any inmate abuse on April 29, 1994. (See, e.g., Barnes Dep. at 67 ("nobody had ever filed a report"); id. at 70 ("I wanted to know because nobody had ever reported it, okay?").) The jury could credit this explanation. Or it could instead believe other evidence, such as the testimony of Carlos that he personally reported the incident to Barnes; or the testimony of correction officer O'Connor that he had discussed the abuse with Barnes and that Barnes characterized the guards' actions as "'great'"; or the testimony of Lieutenant Monroe that at least one of the abusive incidents was actually observed by Sheriff Barnes, and indeed, observed with a smile. Crediting the testimony of these officers, as well as other evidence, the jury would be entitled to infer that Barnes's action in inviting some or all of the accused officers to hear the enhanced tape confirming that the accusing officer was Jeffes was designed to and did directly lead to the harassment of Jeffes.
 
 
 73
 There is perhaps less evidence that Barnes directly contributed to the harassment of Keenan. Nonetheless, a jury could permissibly find that the harassment, intimidation, and endangerment of all of the plaintiffs was at least indirectly caused by Barnes, both through his acquiescence in that misconduct and through his deliberate indifference to the need to train his staff not to retaliate against a fellow worker for exercising his First Amendment rights and assisting governmental investigation of alleged wrongdoing.
 
 
 74
 Barnes's acquiescence in the harassment of plaintiffs for exercising their First Amendment rights could be inferred from the evidence discussed above as to the existence of the code of silence, adherence to which was a routine factor in the Jail's operation, and as to Barnes's insistence on adherence to that code. Also supporting the inference of acquiescence was the evidence that the harassment of plaintiffs and other officers who had spoken out or cooperated in the federal investigation was widespread and conspicuous. That evidence included deposition testimony that some form of harassment or intimidation was visited upon at least nine officers; that the harassment at the Jail occurred on "a daily basis"; that the visual depictions of officers as rats were posted "everywhere and anywhere" around the Jail; that the insults and rat noises over the radio continued for years; and that complaints of the harassment were made to Barnes and other supervisors.
 
 
 75
 Further, given the evidence that the harassing and intimidating misconduct was open and notorious and was avowedly retaliatory against officers for exercising their First Amendment rights and assisting governmental investigation into alleged wrongdoing, the jury could infer that Barnes had deliberately not trained his staff to avoid infringing those rights notwithstanding that the need for such training was obvious. In further support of that inference, there was evidence from Barnes himself that in the past, when the concern was not the code of silence, he had taken prompt action to put an end to harassment and disparagement. He testified that in 1992, he had sent his staff members two communications disapproving of disparaging and demeaning writings posted or scrawled on the walls. One instance involved writings depicting part-time employees as "scabs"; the other involved commentary on sexual orientation. In those instances, Barnes ordered that the posters be removed and that the walls bearing writing be scrubbed or painted; he sent memoranda dated September 15, 1992, and October 29, 1992, stating that such acts would not be tolerated. But between October 29, 1992, and mid-1996, which included most of the period in which these plaintiffs and at least six other officers were harassed, intimidated, and threatened with bodily harm for breaching the code of silence, Barnes took no steps to halt those acts and sent no memoranda regarding proper conduct (see, e.g., Barnes Dep. at 19).
 
 
 76
 In sum, a jury could permissibly find that the code of silence was part of Barnes's standard operating procedure at the Jail and that his affirmative actions were a direct cause of the violations of plaintiffs' First Amendment rights. In light of the scope, duration, openness, and pervasiveness of the retaliation against officers who broke the code of silence, the jury could find that Barnes was well aware of the existence and thrust of those acts of retaliation. Based on his failure to make any effort to forestall, halt, or redress the retaliatory conduct, the jury could well find that, even if Barnes did not directly cause the retaliation, he either acquiesced in it or was deliberately indifferent to the reprisals against officers who exercised their First Amendment rights in breach of the code of silence.
 
 
 77
 Given our conclusion as a matter of law that Barnes was the County's final policymaker with respect to the conduct of his staff members toward one another in this area, any of these findings would suffice for the imposition of liability on the County.
 
 CONCLUSION
 
 78
 We have considered all of the County's contentions in support of summary judgment in its favor and have found them to be without merit. The Rule 54(b) judgment of the district court is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion. We express no view on the overall merit of plaintiffs' claims.
 
 
 79
 Costs of this appeal are awarded to plaintiffs.